**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JACKSON-SHAW COMPANY,

        Plaintiff,

vs.                              Case No. 3:06-cv-84-J-32MCR

JACKSONVILLE AVIATION
AUTHORITY, a body politic and corporate,

        Defendant.

_____

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

In this case, plaintiff Jackson-Shaw Company ("Jackson-Shaw") challenges a long term lease between the Jacksonville Aviation Authority ("JAA" or "Authority") and a competing commercial developer for the developer's long-term use of 328 acres of JAA-owned vacant land adjacent to Jackson-Shaw's development near the Jacksonville International Airport in Jacksonville, Florida.  Jackson-Shaw contends that JAA's agreement with developer Majestic Realty Company ("Majestic")[1], in which the Authority granted Majestic a five to 15-year Option - at no cost to Majestic - to use

_____

[1]      The Option to Ground Lease Agreement at issue here is between JAA and Woodwings East Development, LLC, a Delaware limited liability company, a "Majestic Entity," formed by Majestic.  (Exs.151, 196, 214.)  For ease of reference, the party in agreement with JAA will hereinafter be referred to as "Majestic."

and commercially develop the JAA's property on terms favorable to Majestic, and with virtually no return to the JAA until Majestic's development turns a profit, is unlawful. First, Jackson-Shaw argues that the transaction, which was negotiated between JAA and Majestic without public bids or requests for proposals from other developers, is invalid under JAA's Charter, 2004 Fla. Law 464, and Section 315, Florida Statutes. (Doc. 65.)  Further, Jackson-Shaw argues that the transaction violates the Florida Constitution's prohibition against a government entity becoming a "joint owner" with, or lending or giving credit to, any corporation.  Fla. Const. art. VII, § 10.[2]  Jackson-Shaw seeks declaratory and injunctive relief.  The Court has diversity jurisdiction under 28 U.S.C. §1332.

The Court conducted a four-day bench trial in October 2006 (Docs. 89-92) and heard closing arguments on November 1, 2006.  (Doc. 95.)  Having reviewed the pleadings, examined the evidence, observed the witnesses, read the parties' proposed findings and conclusions (Docs. 93, 94), and considered the arguments, the Court makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

---

[2]     Jackson-Shaw also asserts a claim for relief for attorney's fees under Chapter 119, Florida's Public Records Law, based upon its allegation that the Authority failed to produce all responsive documents upon request.  (Doc. 65, ¶¶ 37-49.)

## I.   The Pertinent Evidence[3]

### A.   The Parties

#### 1.   Jackson-Shaw

Jackson-Shaw is a large 35-year old development company headquartered in Dallas, Texas, with offices in Dallas, Las Vegas, Maryland, and Florida.  It is involved in developments on a national scale, ranging from hotels to office buildings, warehouse and industrial properties.  Implementing its business plan, the company came to Jacksonville in 2004 to research the market and find a commercial development project and entrepreneurial opportunity.  In late summer 2005, Jackson-Shaw made an offer on a privately-owned parcel of commercially developed property known as the Jacksonville International Tradeport ("Tradeport"), which is located near the Jacksonville International Airport.  (Tr. I at 56-60; Tr. II at 216-18, 222; Ex. 9.)[4] Jackson-Shaw entered into a contract to purchase the Tradeport property in October

---

[3]     The Court has considered all of the evidence admitted at trial.  The Court does not include any evidence that it has rejected as unreliable or that it finds irrelevant.  The Court's findings of fact are interspersed throughout this opinion. Conclusions of Law are found in Section II, "Discussion."

[4]     Transcript of the trial in this case, conducted on October 10-13, 2006, appears in the Record at Documents 89-92 as follows: Volume I (Doc. 89); Volume II (Doc. 90); Volume III (Doc. 91); and Volume IV (Doc. 92).  All references to the Transcript and specific page will be cited as "Tr. ___ at __".  Trial exhibits and Bates stamped pages will be cited as "Ex. __ at ___."  Depositions read at trial were admitted as Court Exhibits, and will be cited, along with specific page numbers, as "Ct. Ex. __ at ___."

2005, and the sale closed in February, 2006.  Jackson-Shaw paid $109,000 an acre, or a total of $58,215,000.  (Tr. I at 83; Tr. II at 220-22; Tr. IV at 42, 50; Ex. 91; Doc. 94-2 at 12.)

Tradeport is bounded on the west by International Airport Boulevard, on the north by Airport Road, and on the east by Duval Road.  The southern boundary of Tradeport is adjacent to JAA's property known as Woodwings East, which is the subject of this lawsuit; Tradeport is located immediately to the north of Woodwings East.   When acquired by Jackson-Shaw, Tradeport consisted of nine multi-tenant distributional-type light industrial warehouse and office facilities, totaling 994,000 square feet which was 89% leased,[5] plus seven tracts of vacant development parcels totaling 85 acres.  (Tr. I at 60-61; Tr. II at 220, 222, 224, 264; Tr. IV at 50-51; see Exs. 42, 209.)  Jackson-Shaw is currently attempting to expand the existing Tradeport portfolio of 994,000 square feet of buildings by adding a hotel, restaurants and commercial frontage on Airport Road, a multi-tenant office building, and 500,000 square feet of additional warehouse space.  (Tr. I at 63-64; Ex. 189.) Jackson-Shaw's planned first phase of development is a 400,000 square foot warehouse to be commenced by January 2007; the remaining 600,000 square feet of planned build-out

---

[5]     At the time of trial, the buildings were 98% leased.  (Tr. IV at 50-51.)

will span a five year period.  (Tr. IV at 52-53.)[6]

2.    The Jacksonville Aviation Authority

The JAA is public body, established by Florida law to develop and administer public airports in Jacksonville, Florida.  It is a political subdivision of the state of Florida, 2004 Fla. Laws 464, § 14, and it has responsibility for the planning, management and oversite of four airports located in Duval County, including the Jacksonville International Airport ("JIA") and three smaller air fields, as well as management of a considerable portfolio of undeveloped land.  The JAA derives its power and authority from its Charter, which is a special act of the Legislature.[7]  2004 Fla. Laws 464. (See Tr. III at 18; Ct. Ex. 1 at 28.)[8]  The JAA was created to "operate,

_____

[6]    The Tradeport property was actually purchased by two Jackson-Shaw partnerships.  A Texas limited partnership called Jackson-Shaw Tradeport Buildings, LP, was the purchaser of the 994,000 square feet of buildings; the general partner of the buildings limited partnership is JSC Tradeport Buildings, LP. The seven parcels of land were purchased by seven different "LLC's" (limited liability corporations), formed to each own one of the parcels of land.  The managing member of the LLC's is JSC/Tradeport Land, LP, which is authorized to act on behalf of the LLCs.  Jackson-Shaw Company owns a 2.9% interest in the building side and a 2.9 % interest in the land side of Tradeport.  Additionally, it is the "operator" of Tradeport, deriving fees and commissions in its capacity as developer and provider of advisory, acquisition, disposition, leasing and asset management services.  (Tr. II at 222-24, 259-60; Exs. 136, 137.)

[7]    "'Special law' means a special or local law."  Fla. Const. art. X, § 12(g) (2006).

[8]    Originally a division of the Jacksonville Port Authority, the airport authority split from the port authority in 2001.  The Legislature in 2004 amended the port authority's charter provision by enacting special legislation, Chapter 2004-464,

manage, and control all publically owned airports and ancillary facilities located within Duval County" as provided by statute.  2004 Fla. Laws 464, § 1(1).  The JAA is governed by a seven-member board of directors, four appointed by the governor of Florida, and three appointed by the mayor of Jacksonville.  (Tr. III at 103.)  The JAA possesses no independent taxing authority, and receives its revenues from state and federal grants, landing fees, rentals, concession fees and facility lease fees.

The JAA has approximately 4,000 to 6,000 acres of land in its portfolio available for development, depending upon possible future runway configurations.  Much of the land available is located in the vicinity of JIA including 328-acre Woodwings East, and its sister parcel of vacant land, 890-acre Woodwings West across International Airport Boulevard, though some is predominantly wetlands.  (Tr. I at 89; Tr. III at 237; Ex. 62 at 00105.)  In 2004, the JAA created the Enterprise Division to focus on maximizing the value of the Authority's undeveloped property, and to diversify the JAA's revenue sources.  (Tr. I at 130.)  Bingham Parkinson was named president of the Enterprise Division on October 1, 2004.  (Tr. I at 124.)  The Enterprise Division is comprised of the real estate division and the consultative services division.  The real estate division is responsible for leasing non-aeronautical land at JAA's four airports to enable non-

_____

Laws of Florida, establishing the Jacksonville Airport Authority as a separate body politic and corporate.  2004 Fla. Laws 464.  The Authority was subsequently renamed the Jacksonville Aviation Authority.  2005 Fla. Laws 328.  (See (Tr. III at 103; Ct. Ex. 6 at 16.)  For ease of reference, the Court will refer to aviation activities by JAA's predecessors before 2005 as being conducted by JAA.

aeronautical development and generate revenue to the Authority.  (Tr. I at 129-30.)

Richard Rossi was hired as vice president for the real estate division on January 15,

2005.[9]   Board member Jack Demetree, a long-time Jacksonville developer, serves

as the board's liaison with the JAA's staff in the Enterprise Division.  (Tr. III at 269; Ct.

Ex. 1 at 72; Ct. Ex. 6 at 7, 9-10.)

### 3.   Majestic

Majestic is a private corporation created in 1948 and headquartered in Los

Angeles County, California, with regional offices in Atlanta, Dallas, Denver and Las

Vegas.  Majestic specializes in planning and development of business parks, with its

primary holdings being industrial.  It has an office, retail and industrial portfolio totaling

more than 69 million square feet.  (Exs. 99 at 00049; 128.)  According to JAA board

member Demetree and otherwise undisputed, Majestic has a good reputation as a

developer, and is the largest privately held commercial developer in the country in

---

[9]      Rossi, an attorney, had previously served for nearly eight years as in-house
legal and properties manager at the Sarasota Manatee International Airport, where
he managed that airport's 1,002 acres, 150 acres of which were available for
development. He does not have training as a real estate appraiser or investment
banker in the area of real estate, and does not have a real estate license or
broker's license.  He acknowledged that he was not familiar with nationally
recognized and reputable developers.  (Tr. II at 138-42; Tr. III at 224-28, 236-39.)

Rossi has since been appointed in April 2006 as JAA's chief financial officer.
Inasmuch as he served as vice president of real estate at times relevant, and is
currently still assisting with that position which remains unfilled, he will be referred
to in his capacity of real estate division vice president.  (Tr. II at 137-38.)

terms of amount of square feet of buildings it controls.  (Ct. Ex. 6 at 47.)

In October 2005, while negotiating with JAA over the terms of the Woodwings East project, Majestic purchased 46.8 acres of vacant property at Tradeport, south of but not fronting on Airport Road.  It paid $2.50 a square foot, or $108,900 an acre (or $5,096,520 for the entire parcel).  (Tr. I at 85; Tr. II at 22-23.)

4.    The Property

Woodwings East is owned by JAA and consists of approximately 328 unimproved acres of land lying southeast of JIA.  It is located approximately one mile west of Interstate 95, south of Airport Road and to the north of and contiguous to Interstate 295.  Ground access to Woodwings East is available via Duval Road, which bisects a corner of the property, or via the new International Airport Boulevard.  A portion of the property was acquired by eminent domain.  It is a part of the Jacksonville International Airport Development of Regional Impact ("DRI"), and, at the time of trial, was tax exempt.  (Ct. Ex. 5, ¶ 4; Tr. I at 131; see Exs. 62 at 00075; 194; and 209.)

The Authority had attempted in the past to develop the Woodwings East parcel into an industrial and office park.  (Ct. Ex. 5, ¶ 4.)  In the late 1990's, JAA had discussions with large-scale developer The St. Joe Company ("St. Joe"), which had approached the Authority in 1998 concerning the development of Woodwings East. As talks with St. Joe progressed, the negotiations were challenged by another

8

developer.  In response, JAA issued a Request for Qualifications and Experience. (Ex. 3.)   Though JAA officials mistakenly believed that St. Joe was the only respondent,   (Tr. II at 145-46; Ct. Ex. 1 at 144; Tr. III at 115, 241-42), three developers actually responded in March 1999.  The Authority chose St. Joe of the three. (Tr. III at 137-43; Ex. 50 at 00193.)  Negotiations with St. Joe eventually broke off.  (Tr. III at 115-17, 120; Ct. Ex. 1 at 143-45.)

The JAA retained consulting firm Reynolds, Smith and Hills, Inc. ("RS&H") to prepare recommendations for the highest and best use on undeveloped land at the airport.  On September 15, 2004, RS&H recommended that Woodwings East be "developed as light industrial and commercial sites, with additional uses including service station/retail uses, logistics centers (truck terminals), and other complimentary commercial uses," (Ex. 62 at 00080) and that hotels, restaurants, convenience and services businesses, be located adjacent to the new I-295 interchange. (Id. at 00105; see Tr. I at 94.)

The JAA has never had the Woodwings East property's value appraised. Rather, the Authority estimated the value of Woodwings East based on a price it negotiated to purchase a parcel of undeveloped property located to the northeast. (Tr. 1 at 134-36; Tr. III at 167, 243-46.)  That property, called Percy Oaks, consists of 36½ acres, more than half of which are wetlands.  It is  zoned for single-family residential development.  The JAA purchased Percy Oaks on September 6,  2006 for

$690,000, or $18,904 an acre.  (Tr. II at 62-66.)   Based upon the Percy Oaks transaction, and upon conversations with real estate brokers, JAA real estate division vice president Rossi said the Authority estimated in 2005 that the Woodwings East property was worth between $35,000 and $50,000 an acre, or approximately $10 million. (Tr. III at 243-49.)  At trial, a substantial question was raised whether JAA had failed to properly appraise the property and whether it had undervalued the property for purposes of its negotiations with Majestic.

### B.    Marketing

On August 18, 2003, the Authority conducted a Non-Aviation Real Estate Development Board Workshop to discuss strategies for putting some of the Authority's real estate assets into production, including whether JAA should get directly involved in the development business, constructing infrastructure, and actually constructing buildings for lease.  The goal of the meeting was to generate policy level guidance from the JAA Board regarding JAA's non-aviation real estate development. According to notes of that meeting, JAA had available 700 acres near Jacksonville International Airport, plus nearly 700 acres of non-aviation development property near the other three smaller airports it owns and manages.   (Tr. III at 120-21; Ct. Ex. 1 at 105; Ex. 60.)   While the agenda for the meeting referred to three options for development: 1) ground leases, 2) "JAA build-to-suit," and 3) "JAA's forming partnership with developer to build facilities," executive director Clark testified that the

10

term "partnership" was used only to engender a sense of a business working relationship.  "[W]e will call the airlines our partners . . . [b]ut in fact they're a tenant." "[W]e know [by law] we can't form partnerships."  (Ct. Ex. 1 at 108-09; Ex. 60.)

Also discussed at the strategy meeting was JAA's required rate of return.  (Ex. 60.)  Director Clark testified that the JAA "do[es] not have a required rate of return. What we have operated on is what we consider kind of general norms or practices, industry norms and practices.  And historically we have looked to get anywhere from eight to ten percent return," which he said is the average rate of return in the airport industry.  (Tr. III at 161; Ct. Ex. 1 at 110-11.)[10]

Further, Clark said "it was not our intent to underprice the market or directly compete.  Clearly there is a level of competition, but the intent . . . was to derive revenue for the airport to build that system."  (Ct. Ex. 1 at 120-21; Ex. 60.)

The JAA determined that it would "ground lease only," rather than use the Authority's capital dollars to actually develop the property.  "We wanted to enable development, not be in development," according to Enterprise Division president Parkinson.  (Tr. I at 164.)  At that time and as an outcome of the workshop, the

---

[10]   Enterprise Division president Parkinson concurred that the Authority has no required rate of return.  "[W]e seek anywhere from 8 to 12 percent return on asset. We have not determined exactly what return we would have for . . . land specifically."  (Tr. I at 164.)  Board member Demetree testified that the Authority tries to collect a 10-12 percent per year rate of return on the cost of an acre.  (Ct. Ex. 6 at 57, 60.)

Authority created the Enterprise Division.  (Tr. III at 160; Ct. Ex. 1 at 76.)

The JAA did not retain a listing agent or any person to market the property directly, or a so-called "master developer" to oversee development of all of JAA's non-aviation properties.  (Ct. Ex. 1 at 74-75, 77-78, 124.)  Rather, at the direction of Rossi, the Authority placed two signs on either side of  International Airport Boulevard, one in Woodwings East, and another in Woodwings West.  Additionally, the Authority issued a one-page brochure in 2003-04 stating that the JAA was looking for commercial and industrial development for Woodwings, without specifying that it was interested in a long term-lease.  JAA officials had general discussions with several developers and brokers about the availability of land for development near the airport, and attended chamber of commerce meetings.  The Authority's position was that the term of any leasehold would be determined by the developer's level of investment and its plan to use the land; the larger the investment, the longer the lease.  There were no discussions about possible options, lease terms, or value of the land, or of any specific deals.  (Tr. I at 143-51, 161-62; Tr. II at 143; Tr. III at 129-31; Ct. Ex. 3 at 19-20; Ct. Ex. 6 at 24, 30; Exs. 27, 28, 31.)

The Authority never considered putting the Woodwings East ground-lease development opportunity out for bid, subjecting it to a request for proposal or qualifications.  (Ct. Ex. 1 at 207.)  JAA says did not seek bids or proposals for the property because there was no indication of "multiple interest" in leasing and

developing the property,[11] combined with the fact that JAA had other vacant acreage available to lease for nonaeronautical development.   In addition, as previously discussed, JAA was operating under the mistaken belief that the last time it requested proposals for the property in 1999, only St. Joe responded and negotiations broke down.  "[W]e did it before and it didn't materialize in a contract.  So that's something we wouldn't keep doing and doing and doing," testified Parkinson.  (Tr. I at 152-54; see also Ct. Ex. 1 at 207; Ct. Ex. 3 at 24-25, 72.)

> We had several objectives when we were looking to obtain someone for the Woodwings East property.  One of our main objectives was we wanted to make sure that we did not have to put out any more funds of ours other than the $750,000 [to construct a road] which was committed in our capital budget in 2005 which was the year before we even talked with Majestic. . . .
> . . . We were looking for someone possibly of national exposure . . . who could bring in companies who would increase the payroll and the jobs in the community.
> And also, we were seeking someone who would develop the entire parcel. . . . [W]e wanted a uniform campus, where we had control of the aesthetics and the appearance of the campus.

(Tr. III at 232 (Rossi).)  Specifically, the Authority did not want to be responsible for

---

[11]    About two years ago, another developer, Patillo Construction Company, which specializes in commercial and industrial development, approached JAA about a possible venture on Woodwings East.  The JAA responded that it did not have any specific terms under which it was offering the land, and suggested that the developer submit a proposal to the Authority. The conversations were very limited and Patillo did not pursue the parcel.  (Tr. II at 124, 128-30; Tr. III at 150; Tr. IV at 11.)

providing other infrastructure for Woodwings East, which the Authority estimated would cost $8 to $12 million, and would necessitate the Authority borrowing money impacting its debt ratios that it must maintain for an outstanding bond covenant. (Tr. III at 235.) Most important, the Authority was looking for a long-term revenue stream. (Id.)

"Majestic . . . came to the table, we had discussion with them, and we didn't see the need to put it out [for bids]." (Ct. Ex. 1 at 207-08 (Clark); see also Tr. III at 135-36, 145; Ct. Ex. 1 at 210-11, 236.) Before reaching an agreement with Majestic, JAA reveived no indication or communication from Jackson-Shaw that it would be interested in leasing the Woodwings East property. (Tr. III at 148.)

### C. Negotiations

Majestic executives first contacted JAA by telephone in February 2005, saying that they saw the JAA's "For Lease" sign advertising Woodwings East. (Tr. II at 147-49; Exs. 27, 28.) Several weeks later, Majestic officials, who were fact-finding and looking into development possibilities in north Jacksonville, met with JAA real estate division vice president Rossi. This was followed by a series of phone conversations in which Majestic inquired into JAA's requirements for business deals. The JAA provided the company with a map, and on March 24, 2005, Majestic forwarded to JAA by e-mail "a preliminary overview of the real estate and partnership structure we would propose creating (referred to as the Participating Ground Lease 'PGL')."

14

attaching an outline of a PGL which provided for a long-term ground lease typically 50 years or longer.  The overview explained that under the proposed PGL, the JAA and Majestic would split 50-50 the net revenues generated by the lessee's improvements on the land, and JAA's fee title would not be subordinated to the financing required to build the buildings or to attachment of liens.  (Tr. II at 149-50; Ex. 64.)  Rossi was the primary day-to-day JAA contact with Majestic.  (Tr. III at 239, 250; Tr. IV at 14-15; Exs. 64-66.)

In May or June 2005, Shane Bohart, Majestic's associate director for national development, met at JAA a second time, this time to discuss what Majestic envisioned for developing the property as a commercial distribution center. Majestic's proposed use was acceptable to JAA because "[w]e wanted someone to develop the entire parcel as one.  We did not wish to piecemeal develop it" because the Authority wished the parcel to be aesthetically uniform.   "We were also looking for someone with a substantial track record and successful track record in developing large pieces, where you had multiple buildings." (Tr. II at 150-51 (Rossi).)   The JAA requested that Majestic provide a site plan, which Majestic did in June or July, 2005.  The possible structure of a transaction was not initially discussed.  Several informational meetings followed throughout the summer of 2005.  (Tr. II at 152-57.)

Majestic supplied JAA with a participating ground lease form which it had used in other locations, and JAA provided Majestic with land lease forms containing

15

provisions necessary to JAA.   JAA worked with its legal counsel, the City of Jacksonville's general counsel's office, to "draft a lease arrangement."  Negotiations between Majestic and JAA  were conducted via telephone; the only written record of the negotiations was the multiple successive and evolving drafts of the proposed agreement.  (Tr. II at 164-66.)

What emerged from the discussions by autumn 2005 was a two-part transaction: the Option to Ground Lease ("Option") between JAA and Majestic, and the incorporated Participating Ground Lease Agreement ("PGL").   The proposed Option granted Majestic five years to enter into the first PGL with the Authority for a sub-parcel and to commence construction of commercial buildings.  As construction proceeded, the Option would extend to up to 15 years, and Majestic and JAA would enter into a series of 65-year PGL's for sub-parcels of Woodwings East on which Majestic would construct, operate and manage commercial buildings, leasing those buildings to third party tenants.  Majestic and JAA would split the net revenue from those third party tenants on a 50-50 basis, after Majestic's development, capital, and administrative expenses and other fees had been deducted from gross revenues. Majestic would not be required to pay for the Option.  (See Exs. 73-80.)  The parties did not negotiate over whether Majestic should pay a fee in return for the Option, or whether JAA should recover more than 50% of the net revenue.  (Tr. III at 263.)

On October 12-14, 2005, Rossi and Parkinson traveled to Los Angeles and met

16

with management of Majestic "to complete the negotiations for their proposed ground lease of Woodwings East and to visit some of Majestic's business parks in Southern California to gauge the quality of their developments." (Tr. II at 158; Tr. IV at 19; Exs. 82, 83, 88.) However, inasmuch as negotiations over the framework were "pretty much completed," there were no counter-proposals discussed at that meeting. Parkinson wrote that as a result of the meeting, JAA and Majestic "hope[d] to finalize the terms and conditions of the proposed lease . . . by December 2005." (Tr. I at 174; Ex. 88.)

A two-page Majestic "PGL Proforma Illustration" summary, dated October 12, 2005, projected that the 3,378,000 square feet of buildings to be built by Majestic at Woodwings East would return to JAA $898.9 million of total revenue rent over the 65 year term of the PGLs, plus the $754.2 million projected future value of the "buildings/land" at the end of the PGLs, for a "total value to JAA" of $1,653,100,000. (Ex. 20; see Ex. 84 at 00486.) Majestic also presented a multi-page and detailed financial *pro forma* analysis, illustrating the projected year by year cash flow over the 80 year term of the deal. (Ex. 81.)

On October 13, 2005, Majestic wrote to Parkinson and Rossi that "[a]s discussed, Majestic Realty Co. remains interested in establishing a long-term partnership with the Jacksonville Aviation Authority via a Participating Ground Lease ("PGL") structure in regards to the 'Woodwings East' real estate (326.88 acres)." (Ex.

84 at 00465.)  The binder provided by Majestic included Majestic's proposed site plan concepts (master plan and phase 1), construction issues, financial *pro formas*, and the "[m]ost current version of the PGL document." (Id.; Tr. IV at 19.)

Parkinson said he looked at the "rental structure" and the "revenue potential" set forth in the *pro formas* but did not verify any of the numbers provided by Majestic or ask anyone to do so.  Rather, he relied upon Rossi to determine whether the *pro forma* numbers were valid and that the proposal was comparable to the market rate of similar properties.  (Tr. I at 169-71, 193.)  However, Rossi said that he never questioned or challenged Majestic's *pro forma* financial estimates.  (Tr. III at 272-74.) Clark said he believed Parkinson and Rossi analyzed Majestic's proposed rent structure to determine whether it met the Authority's 8 to 10 percent desired rate of return and he relied on Rossi and board member Demetree's analysis of the transaction.  (Tr. III at 161-62, 169.)  Board members Burnett and Demetree both assumed that the Enterprise Division verified Majestic's numbers to determine that they were comparable to the market.  (Ct. Ex. 3 at 73-74; Ct. Ex. 6 at 70.)

Upon return from California, Parkinson and Rossi reviewed the Majestic proposal with Clark and other members of JAA senior management team.  None of the managers raised any concerns or had any specific questions.  (Tr. I at 176-77.) When asked if he applied any "investment criteria" to evaluate the Majestic proposal, Parkinson said he "looked at the revenue stream that . . . the aviation authority would

18

generate on that deal . . . the rental income plus the value of the investment, at a tune of about 1.6 billion [and] I thought that was a very, very good deal for the aviation authority," which he said was a better return than any other JAA lease.  Furthermore, Parkinson estimated that the Authority would average $25 million in annual revenue. Parkinson did not calculate the "rate of return" to JAA on the project, assuming that Rossi had done so.  (Tr. I at 190-93.)  Rossi said he made no studies into the validity of Majestic's *pro forma* numbers or rate of return on the project.  (Tr. III at 272-74.)

At that point, following the October 2005 trip to Los Angeles, the JAA staff had concluded that Majestic and its proposal "met the [JAA's] parameters."  "I was ready to do the deal, assuming we could come to terms on the contract.  They met my objective."  (Tr. II at 159. (Rossi).)  Based upon the "due diligence" by Rossi, and the *pro formas* provided by Majestic, Clark, Parkinson, and Rossi decided to recommend to the JAA Board that it approve the proposed agreement with Majestic.  (Tr. I at 183- 85; Tr. IV at 20.).)

Parkinson and Rossi first met with board member Jack Demetree. (Tr. II at 160; Ct. Ex. 6 at 63.)  Demetree said he and Parkinson and Rossi went over the details of the October 2005 Majestic proposal, which Majestic had recalculated as of October 24 to yield an additional $20 million in net revenue to JAA.  (See Ex. 90.)  Demetree's concern was JAA's cost to attract Majestic to the property, and Majestic's proposed rental which was based upon an equal split of the project's net revenue; the bottom

line being how much money would flow to the Authority.  (Ct. Ex. 6 at 53-54.)  Board chairman Burnett said she first heard about the Majestic proposal in October or November 2005, and that Clark briefed her "as to what a great deal this was going to be.  That we had somebody who was interested in leasing Woodwings."  She testified that she did not review the Majestic written presentation or *pro formas*.  (Ct. Ex. 3 at 40-41, 45-46.)

Parkinson next scheduled individual meetings with JAA board members for November 15, 2005, because of the self-imposed "time constraints" to consummate the deal before the end of 2005,  and the "complexity of the deal."  The meetings provided an opportunity for the JAA staff and Majestic representatives to brief the board members and to get their input prior to the next JAA board meeting.  The individual meetings were conducted in the same JAA location, one after another.  (Tr. I at 177-78; Tr. II at 158-61; Tr. III at 164-66; Tr. IV at 32-34; Ex. 92.)[12]

On November 30, 2005, two JAA board members traveled to California to view Majestic's developments located there.[13]  (Tr. I at 179; Tr. II at 166-70; Exs. 103, 115.)

---

[12]   When asked if the individual meetings "have anything to do with the Sunshine laws," Rossi responded: "Sure it does. . . . You can't discuss with more than one board member present.  And this way it gives them an opportunity - an opportunity for an open discussion and to voice their concerns or ask their questions.  Absolutely."  (Tr. II at 160-61; But see Tr. III at 166 (Clark: "[w]e're not trying to violate the Sunshine law.  We're not going to do that.").)

[13]   Attending this meeting in California were JAA board members Russ Jollivette and Charles Spenser, City Council member Glorious Johnson, and JAA

Majestic provided JAA with a Participating Ground Lease *pro forma*, which Majestic endorsed as enabling JAA to "[r]ealize more value from your vacant land without selling" and without subordinating JAA's fee interest to the financing of the improvements on the land.  (Tr. I at 179; Ex. 99 at 00036-37, 00040, 00094-95.) Majestic characterized the deal in which it would split net revenues generated by the leased improvements 50-50 with the JAA as a "win-win solution for both Landowners and Majestic alike."  (Ex. 99 at 00037-40.)  By late November, the JAA, through its legal counsel, presented Majestic with a proposed contract representing the melding of the parties' positions.  (Tr. II at 171-72.)

On December 19, 2005, the Option and incorporated PGL were presented to the JAA board of directors for the first time in a public meeting.  The meeting was noticed on December 13, and the agenda for the meeting was on file at the Authority. (Tr. IV at 39; Ex. 124.)  The Submission for Board Approval, which describes the framework of the deal,  advised that

> Pursuant to its charge of diversifying the Jacksonville Aviation Authority's ("JAA") non-aviation revenue stream through the development of non-aeronautical real estate at JAA airports, the Enterprise Division identified and concentrated its efforts on the unimproved JAA real estate known as Woodwings East.
>
> . . .

executives John Clark, Bingham Parkinson, and Richard Rossi.  (Tr. I at 179; Exs. 103, 115.)

> The proposed arrangement provides JAA with a vehicle to generate significant cash flow for vacant non-producing land with a large industry leader with a successful track record of performing as promised and generating significant cash flow for landowners.

(Tr. I at 189; Exs. 10 at 1, 2; 128 at 1, 2.)   The proposed transaction was described as "a master plan development of the Woodwings East premises under a cash flow sharing lease agreement."  As presented to the Board,

> Under the Option to Ground Lease Agreement ("Option"), JAA grants Majestic the right/option to ground lease the Woodwings East premises ("Option Premises") for a term not to exceed fifteen (15) years.  In order to prevent "land banking", the initial option term is five (5) years.  It is extended one year for each one hundred thousand square feet (100,000 sq. ft.) of income producing properties Majestic constructs on the Option Premises up to a maximum of fifteen (15) years.

> Under the Participating Ground Lease (PGL) JAA leases a portion of Woodwings East option parcel to Majestic for a term of sixty-five (65) years.  Majestic would design, finance, construct, manage, lease and operate the new building constructed on the PGL premises.  The net revenue generated by the leased improvements would be split equally (50-50) between JAA and Majestic.  The Net revenue computation is total revenue less project/operating costs, reserves (i.e. roof; mortgage etc.) and repayment of any equity contributions.

JAA would retain fee ownership of the lease premises, "and there is no subordination of JAA's fee interest to the financing required to build the buildings.  JAA has no risk of liens attaching to the lease Premises as Majestic bonds against or discharges all liens made or filed."  (Ex. 128.)  As part of the deal, JAA committed to spend

22

$750,000 from its capital budget to extend Alvarez Road into the Woodwings East parcel.  (Ex. 128; Ct. Ex. 3 at 31.)

Clark testified that the Majestic deal is in the best interests of the Authority because "it's a favorable agreement . . . [that] meets exactly what we were intending to happen" because it "put[s] into place a long-term cash flow to the authority."  "On the short-term basis, we believe we have the abilities to raise revenues. . . . It's the longer term and the intermediate term that we wanted."  The projected revenue over the 85-year life of the project "is very important to where we want to take the Aviation Authority future capital requirements."  (Tr. III at 122-23; Ct. Ex. 1 at 218.)

According to board chairman Burnett, the presentation was that this was a good use for the property; "[t]here was some conversation before we voted at the board meeting . . . and this was a good thing to do for the JAA."  (Ct. Ex. 3 at 49-51, 59 ("explanation and questions and answers" and "discussion"); Ex. 128; see also Ct. Ex. 6 at 66 (Demetree told the board that this was a "good deal").)  ""[T]here was some discussion as to whether an option with no money was good or not.  But we do a lot of incentive things to get companies to come to Jacksonville . . . ."  (Ct. Ex. 3 at 62.)  As to the Option, Burnett testified that inasmuch as the land has been vacant, "[i]f that's what it takes to get somebody to lease this property . . . , let's do whatever it takes to make the deal work."  (Id. at 62.)

The JAA board unanimously approved the Option and PGL and authorized

23

Clark to enter into and execute all necessary agreements.  (Ex. 127 at 129.)  Burnett said she voted for the project based upon the briefing at the meeting and the paper submission to the Board (Ex. 10) because "I thought in the best interest of the Jacksonville International Airport this was the right thing to do. . . . This was a good use for this property . . . [I]t's been vacant for many years.  It was going to generate revenue.  It was going to give people jobs.  It was a good thing for the community." (Ct. Ex. 3 at 56-57, 59-60.)  Demetree called the transaction "[a] fair deal."  Demetree said he was not troubled by the "revenue rent" model because Majestic has incentive to make the project profitable.  (Ct. Ex. 6 at 60-62.)

At the time the Majestic proposal was submitted to the Board in December 2005, JAA was not aware that any other developer, including Jackson-Shaw, was interested in the property.  (Tr. III at 155; Ct. Ex. 1 at 239-40; Ex. 130.)  Likewise, Thomas Jones, partner in Jackson-Shaw and its northeast Florida regional developer, testified that his company was not aware that JAA would be willing to enter into a long-term lease for the property, but believed the Authority was only interested in short-term leases, which would not be economically viable.  (Tr. I at 104.)  Jones acknowledged that he had never met with Authority board members or staff to discuss the possibilities or intended use of the subject property.  (Tr. I at 101-102.) The first time Jackson-Shaw learned of the JAA-Majestic transaction was in the newspaper after the JAA Board approved the deal on December 19, 2005.  (Tr. I at 67; see also

24

Tr. II at 131.)

Clark testified that as of December 2005, the Authority would not consider another proposal to lease and develop Woodwings East, even if more lucrative, because JAA and Majestic negotiated in good faith, and "I am not a supporter of . . . shopping a deal. . . . I don't think that's fundamentally fair way to do business," or "prudent business judgment."  (Ct. Ex. 1 at 232, 240; see also Tr. II at 144, 178 (Rossi: bidding would hurt JAA's credibility with potential developers by putting out negotiations on the street to bid against, taking advantage of the first party's work); Tr. III at 149, 170; Ct. Ex. 6 at 35, 80 (Demetree: the JAA is "not going to shop somebody's bid" when the number is a "fair number"; "[w]e don't do that.  That's not fair".)  Further, said Clark, the JAA has other non-aeronautical vacant property available for lease and development, and will entertain offers on that property.  (Ct. Ex. 1 at 232.)

After Board approval in December 2005, negotiations between JAA and Majestic about a number of specific terms continued in 2006.  Among the issues negotiated was whether Majestic should pay JAA a fixed rent for its participating ground lease before the availability of "net revenues" to split.  In January 2006, Rossi, in an e-mail to Majestic's Shane Bohart, said that because of the Florida Constitution's prohibition of public agencies such as the JAA "from entering into joint ventures or partnerships," JAA must have a "'guaranteed return' or income on the

venture."    Rossi said that without a fixed rent component, the office of the general

counsel "advised that the PGL was a joint venture and prohibited by Florida law."

Rossi suggested that Majestic pay JAA "'the greater of $500/ per acre or the market

rate'" (i.e. the 50-50 net cash flow sharing agreement in the PGL), and that JAA would

then contribute $600 per acre for infrastructure costs or other stated expense.  Under

Rossi's "fixed rent" proposal, Majestic would come out ahead $100 an acre.  (Tr. III

at 258; Ex. 140.)    Rossi's ill-considered idea to try to circumvent the Florida

Constitution was scrapped.  (Tr. III at 262.)

A fixed rent was indeed added  on the advice of JAA's counsel.  The $500

fixed rent figure appeared in a February 1, 2006 Majestic Draft of the PGL, but the

JAA responded that the amount of fixed rent should be changed to $1,380+, and that

JAA would be paid the greater of fixed rent or net revenue rent each year.  (Exs. 158,

at MAJ-1289; 162 at MAJ-0269; 163 at 1020.) The fixed rent amount of $1,380 per

acre per year was calculated by determining the value of a 7 percent rate of return on

a $16,000 per acre value (which was the value of the Percy Oaks property which JAA

was negotiating to purchase).  (Tr. III at 252-55.)

On September 18, 2006, the JAA board of directors, in a public board meeting,

approved the resultant Option and PGL.  The September 2006 board submission

mirrored that provided to the board in December 2005 with several amendments.  In

addition to the fixed rent provision, additional information as to the Option was

provided in summary:

> The Option to Ground Lease Agreement (Option) grants Majestic a five year right/option to ground lease the Woodwings East premises (Option Premises).  The Option term can be extended by one (1) year for every 100,000 square feet of commercial buildings substantially completed within the Option Premises up to the maximum term of fifteen (15) years.  Substantially completed means the roof and exterior walls for the proposed commercial building have been completed.
>
> The Participating Ground Lease (PGL) comes into effect when Majestic elects to exercise the Option and take down a portion of the Option Premises.  Under the PGL JAA leases the portion of the Option Premises taken down for a lease term of sixty-five (65) years.

(Ex. 196.)

The Option was signed by Majestic Realty Co., and then by Clark on October 9, 2006, the day before the commencement of the trial in this case,  (Tr. III at 151; Ex. 214); thus it is now a binding agreement.

### D.  **Jackson-Shaw's Proposal**

On May 26, 2006, after the initiation of this lawsuit and in response to Clark's deposition testimony that the Authority had never received any other offers on the property, Jackson-Shaw made an offer to the JAA to lease 25 acres of the Woodwings East parcel located immediately south of and adjacent to Tradeport at the intersection of Alvarez and Duval Roads.  Jackson-Shaw offered to "pay a fixed monthly rent equal to 8% per annum of the appraised fair market value for all 25

27

acres, beginning with the completion of a building site and infrastructure by the JAA of a minimum of 15 acres."  "Our plan would also call for the southern extension of Alvarez Road [by the JAA] through Woodwings East, with development to occur on either side of this new access corridor," approximately the same location as Phase I of Majestic's project.  The Jackson-Shaw proposal would required JAA to contribute "infrastructure", including the $750,000 Alvarez Road extension, drainage, water, sewer, electrical and other utilities.  Under the proposal, ground rent would start at approximately $8,712 per acre per year, or $217,800 per year on the first 25 acre tract, and would increase every five years at 50% of the increase in the appraised valuation of like and similar tracts. The proposal stated: "Term: 65 Years, effective with the completion of the site [of the first lease]." (Tr. I at 95-97, 107-08; Tr. III at 155; Exs. 189, 191.)

Jackson-Shaw's proposal also contained an offer for a 65-year "rolling" option for future developments, for which it proposed to pay $25,000 upon execution of the initial lease at which time it would identify the next 25 acre tract on which it would hold a five-year option.  Upon execution of the lease on the second 25 acre parcel, Jackson-Shaw would pay a second $25,000 option fee, identifying an additional 25 acres for the second option.  Rent would be 8 percent of the appraised market value, tracking the formula and terms of the first lease.  Land not under option would be available for other investors and uses.  (Ex. 189.)  There was no provision for the

sharing of any profits with JAA.

On July 12, 2006, the JAA, through its counsel wrote to Jackson-Shaw that it was unable to respond to the proposal because the parties were involved in the instant litigation.  (Tr. 1 at 197; Ex. 195.)

### E.    The Transaction

#### 1.    Summary

The JAA approved a two-part agreement with Majestic,[14] granting Majestic an option to designate and lease sub-parcels for commercial development from the 328-acre Woodwings East parcel for a period of five years, with the right to extend the Option up to 15 years.  The Option encumbers the entire 328 acre tract, and is at no cost to Majestic.  After exercising the Option on a sub-parcel by the end of the 5-year Option period, Majestic has up to four more years to prepare to lease it, all without a return to the JAA.  The 65-year ground lease (PGL) which is incorporated into the Option, to be executed by the JAA and Majestic for each sub-parcel, provides Majestic an additional four years to "substantially complete" commercial development on the property.  After a one-year grace period from the closing on each PGL, Majestic would pay JAA either a "fixed rent" of $1,380 per acre per year on the leased sub-parcel, *or* 50 percent of the "net revenue" generated by Majestic's sub-leases of

---

[14]    The signed Option to Ground Lease Agreement and incorporated Participating Ground Lease is Trial Exhibit 214.  Their provisions will hereinafter be cited as "Option at ___, ¶ ___" and "PGL at ___, ¶ ___."

the commercial development ("revenue rent"), whichever is greater.  "Net revenue" is determined after Majestic is reimbursed from gross revenue for all pre-development costs, management fees, construction costs (to an affiliate of Majestic), design, maintenance, financing, infrastructure and other costs and "advances", with interest, and all "fixed rent" paid.  Thus, at the point when JAA and Majestic each start receiving "revenue rent," Majestic will have been reimbursed for all costs and money spent, and will have already realized market-rate profit from recoupment of fees and costs, and thus will be virtually out-of-pocket nothing.  The JAA is obligated to construct a $750,000 road extension into the Woodwings East parcel, and to provide up to 50 acres of wetlands mitigation land, if necessary.  These expenses are not reimbursed to the JAA.

Relevant specifics of the documents are as follows.

2.    Option to Ground Lease Agreement (Ex. 214.)

The Option encumbers the entire 328 acre Woodwings East parcel, at no cost to Majestic, and gives Majestic the five-year right until October 5, 2011, to begin leasing parcels within Woodwings East (a procedure called "taking down" of parcels) by entering into a PGL, incorporated into the Option, on the parcel that it designates from the project's master plan. If Majestic builds 100,000 square feet of building area on the designated parcel to "substantial completion," the Option agreement is extended for an additional year. By continuing to "substantially complete" building

30

area, Majestic can extend the Option up to a maximum of 15 years, including the initial five.  In practice, if Majestic builds 100,000 square feet of building per year for ten years, it would have used fifteen years and would have constructed a million square feet.  (Option at 1-2,  ¶ 1; Ct. Ex. 5, ¶ 6; <u>see</u> Vol. II at 28.)  A separate PGL is contemplated for each development parcel with a project development plan.  (Option at 6, 7, ¶¶ 3.5, 3.7.)

Majestic is not obligated under the Option to enter into a PGL until the Authority approves the project development plan for the designated parcel, <u>and</u> Majestic completes several "performance benchmarks."  The performance benchmarks provide the timetable for Majestic's performance in preparing a parcel for construction, including obtaining a wetlands survey, applying for wetlands permits, submission of a project development plan to the City of Jacksonville for review, and applying for a building permit.   (Option at 17-18, ¶ 12.1)   If Majestic fails to comply with the performance benchmarks, the JAA's sole and exclusive remedy is to terminate the Option as to the particular parcel.  (<u>Id</u>. at 18, ¶ 12.3.)  The initial five-year Option term, and Majestic's obligations under the performance benchmarks, are further tolled while this lawsuit is pending through trial and appeal, though notwithstanding the tolling period, the option term may not exceed 15 years from the date of the Agreement. (Option at 18, ¶ 12.2.)

Jackson-Shaw expert C. Allen Watts testified without contradiction that these

benchmarks, if all exercised to the maximum amount of time allowable, conceivably could delay the closing on a PGL, and thus the recovery by the JAA of any rent, for the development parcel for an additional four years or a total of nine years from the exercise of the Option (plus an additional one-year grace period provided by the incorporated PGL agreement, for a total of 10 years out), all without Majestic breaching or forfeiting the Option.  If, after the nine years, Majestic fails to close on the PGL, it withdraws the exercise of the Option as to that development parcel, and may walk away from the deal, without liability for breach or damages to the Authority. (Tr. III at 44-47, 70-73.)  The benchmark timetable was not provided to the Board in December 2005, but was in the September 2006 draft of the Option approved by the Board.  (<u>Compare</u> Exs. 120, 201.)

The JAA's obligations under the Option include constructing the currently planned and budgeted north-south extension of Alvarez Road through the Woodwings East parcel at a cost "not to exceed" $750,000.  (Option at 19 ¶ 13.1.)[15]  Further, the JAA agreed to provide, at no cost to Majestic, up to 50 acres of wetlands mitigation that may be required by Majestic's development of Woodwings East (in addition to wetlands mitigation required for the Alvarez Road extension).  Any additional wetlands

---

[15]     The first phase of Majestic's development, involving the construction of three buildings, requires JAA to extend Alvarez Road, a public road, into the interior of the Woodwings East parcel.  (Tr. I at 91; <u>see</u> Ex. 99 at 00060, 00098.)

mitigation required by Majestic will be treated as an "advance" and reimbursed to Majestic out of gross revenues.  (Option at 20 ¶ 13.5.)

"Advances" means costs incurred by Majestic, including all "pre-development costs," approved infrastructure costs; and other enumerated costs incurred in modification of the PUD; relocation of an electric utility easement; signs; obtaining required government approvals and permits for development; land platting; and wetlands mitigation expenses.  (Option at 2, ¶ 2.2; at 10, ¶ 5.1; at 11, ¶ 6.4; at 13, ¶ 7.1; at 15, ¶¶ 8.2, 9.1, 9.2; at 17, ¶¶ 10.1, 10.2, 10.4; at 20, ¶ 13.5.)

If the Option is terminated or expires (other than because of breach by the Authority) Majestic may recoup all unreimbursed pre-development costs and approved infrastructure costs through the then-existing PGLs.  (Option at 16, ¶ 9.4.) If JAA materially breaches the Option or any PGLs, then JAA must reimburse all outstanding pre-development and infrastructure costs paid by Majestic.  (Id. at 16, ¶ 9.5.)

Each project development budget will include a 4% Development Fee to be paid to Majestic.  (Option at 5, ¶ 3.2.)  All costs incurred by the JAA to comply with its obligations under the Option, however, shall not be treated or reimbursed to JAA as an "advance."  (Option at 15, ¶ 9.2.)

JAA agreed in the Option that Majestic can use its affiliate, Commerce Construction Co., for construction of the commercial buildings on the designated

development parcels.  (Option at 17, ¶ 10.2.)

      3.   <u>Participating Ground Lease (Ex. 214.)</u>

The terms of the 65-year PGL, (<u>see</u> PGL at 10, ¶ 1.2.1), which is incorporated

as Exhibit "C" to the Option, describe the rent and revenue structure of the transaction

between JAA and Majestic.

"Rent" is the greater of 1) $1,380 per acre per year per year, subject to periodic

increases based upon the Consumer Price Index, ("Fixed Rent") or 2) 50 percent of

the net revenue during each whole or partial calendar year ("revenue rent").  (PGL at

9, ¶ 1.1.44.)  "Net revenue" is defined as cash remaining after deduction from total

revenue of Majestic's 1) debt service; 2) project costs (<u>all</u> costs incurred and paid by

Majestic in designing, development, financing, constructing, owning, operating,

maintaining, leasing and managing the premises and commercial facilities); 3) a

"reasonable reserve" for future project costs or as required by any lender to Majestic;

and 4) repayment of advances[16] with interest set at 250 points over prime.  (PGL at

7, ¶ 1.1.33, 1.1.40; <u>see also</u> PGL at 1, ¶ 1.1.1; at 4, ¶ 1.1.22.)

Rent does not commence until one month past the first anniversary following

the effective date of the PGL.  (PGL at 12, ¶ 1.7.1.)  Thus, once Majestic enters into

a PGL with the Authority, it receives one year rent-free.  Further,

_____

[16]    The term "equity contribution" was used in the December 19, 2005 and September 6, 2006 submissions for Board approval, The term "advances" was later substituted.  (<u>See</u> Exs. 128, 196, 214.)

> Once Revenue Rent is payable to [JAA] by [Majestic], the amount of all Fixed Rent previously paid by [Majestic] at any time during the Term of this Agreement shall be credited, dollar for dollar, against the Revenue Rent otherwise payable by [Majestic], thereby reducing the amount of Revenue Rent actually payable, provided the total Rent paid to [JAA] by [Majestic] shall not be less than the Fixed Rent payable under this Lease.  Such crediting of previously paid Fixed Rent shall continue throughout the Term of this Agreement.

(Id.)

As in the Option, "development fees," which are reimbursed to Majestic from gross revenues prior to determination of "net revenue," means the fee paid to Majestic in the amount of four percent of the construction and improvement costs in the development budget.  (PGL at 2-3, ¶ 1.1.13.)  "Management fees" paid to Majestic for the administration of the commercial facilities in Woodwings East range from three to five percent of the total revenue received by Majestic from sublessees.  (PGL at 6, ¶ 1.1.31.)

The PGL requires construction to commence on the development parcel within two years of the execution of the PGL, and for construction to be substantially complete two years later, otherwise, Majestic will be in breach of the PGL.  (PGL at 11, ¶¶ 1.5.2.1, 1.5.3.)  Thus, if Majestic uses all time provided under the PGL, revenues from sublessees may not be generated for four years or more after a PGL is signed.

While the PGL contemplates no incumbrance or liens on JAA's fee simple title

35

to the land, (PGL at 21, ¶ 2.6.1; id. at 30, ¶ 2.15.1),[17] loans to Majestic in connection with its development of commercial facilities and improvements on the land "may be secured by a mortgage or deed of trust encumbering the leasehold estate" created by the PGL.  (PGL at 5, ¶ 1.1.29; see also Id. at 29, ¶ 2.15.1.)  If the leasehold interest is foreclosed upon by a Majestic lender, revenue rent may be abated.  (Id. at 13, ¶ 1.7.4.1.)  Thus, Majestic's lenders may foreclose on its leasehold interest, and the foreclosing lenders will step into Majestic's shoes, assuming a preferred position, with its debt being repaid prior to maintenance expenses, and prior to the determination of net revenue to be shared with the Authority.  (See Ex. 119.)

All improvements and buildings constructed on the premises by Majestic are owned by Majestic until the expiration or termination of the PGL.  (Id. at 10, ¶ 1.3.3.)  At termination of the PGL, Majestic will leave the premises and title and ownership in the buildings and other improvements to the property will pass to JAA.  (Id at 29, ¶¶ 2.14.1, 2.14.2.)

If Majestic defaults on the PGL by failing to pay rent, or abandoning the premises or failing to fulfill other terms and conditions set forth in the agreement, JAA may pursue all rights in law and equity.  Any money judgment in favor of JAA resulting

---

[17]     The cost to Majestic of bonding against or discharging a lien on the fee is treated as a "project cost" and reimbursed out of gross revenues before the split distribution of net revenues, or "revenue rent" to the Authority.  (PGL at 21, ¶ 2.6.1.)

from default by Majestic "shall not exceed an amount equal to the fair market value of [Majestic's] interest in the Premises," subject to several exceptions, including when Majestic "intentionally commits waste on the Premises."  (PGL at 27, ¶ 2.11.7.)

## F .   Expert Real Estate Testimony

Heyward Cantrell, professional real estate appraiser, broker and consultant, provided expert testimony and analysis of the transaction on behalf of Jackson-Shaw.[18] Cantrell testified that he appraised Woodwings East in April 2006 by comparing the value of sites in the Tradeport area, including the price Majestic paid for property in Tradeport, and other industrial parks in north Jacksonville.  Cantrell concluded that the value of Woodwings East was $2.60 a square foot of developable area (which does not include wetlands), or $113,256 an acre (or approximately $25 million for 225 usable (non-wetlands) land.  (Tr. II at 14, 21-23, 62-65, 107.)  Using the standard annual rate of return on the use of real property of 10 percent (the median rate between the standard range of 8 and 12 percent), the market lease rate for Woodwings East is between $10,000 and $10,900 per acre per year, according to Cantrell.  (Tr. II at 51-53.)

Cantrell opined that 1) the transaction between JAA and Majestic is below market value and provides economic assistance from a public entity to a private

---

[18]     The Court accepts Cantrell as an expert in the field of real estate valuation and transactions.  The JAA did not present outside expert testimony concerning the real estate and financial aspects of the transaction.

business; 2) the benefit of the transaction is more than incidental to Majestic; 3) the transaction enables Majestic to unfairly compete with private business; and 4) the JAA has not exercised sound prudent business judgment or acted in the best interest of the Authority.  (Tr. II at 32; Ex. 11.)  In reaching this conclusion, Cantrell focused upon the following features of the Option and PGL:

a)   The Option gives Majestic control over 234.15 acres of usable land for up to 15 years at no cost;[19]

b)   JAA provides a $750,000 road extension and 50 acres of suitable land to provide wetlands mitigation, plus additional wetlands mitigation land necessitated by the road extension (at a cost of $47,500 to $62,500 per credit), at no cost to Majestic;[20]

c)   The fixed rent of $1,380 per acre per year (which Majestic pays if greater than the JAA's 50 percent share of net revenue).  The market rate, according to Cantrell, is 7.25 times that amount;

d)   Majestic recovers from gross revenues for all "advances" made by Majestic, plus interest at 250 basis points over prime rate, prior to determination of the project's net revenues.   Advances may include additional wetlands mitigation required;

e)   Majestic receives its development fees in the amount of 4 percent of the construction and tenant improvement costs, out of gross revenues, prior to

---

[19]   Cantrell did agree that the 15 year build-out timetable for the proposed project was realistic.  (Tr. II at 84-85.)

[20]   According to Cantrell, the infrastructure within the interior of a development is typically provided by the developer. (Tr. II at 113.)

the determination of net revenues, which fees according to Majestic's November 15, 2005 *pro forma*, will equal $6,732,207 upon full build-out of the contemplated project;

f)      Majestic receives a monthly Property Management Fee of between 3 percent and 5 percent of the rental revenue buildings, which according to the Majestic *pro forma* will equal $68,359,353 over the life of the agreement;

g)      Majestic receives leasing commissions, which based upon the Majestic *pro forma*, will equal $64,783,425;

h)      Majestic's affiliate Commerce Construction Co. L.P. will be paid total construction fees estimated at $13,464,413.

(Ex. 11; Tr. II at 30-36, 39, 40-47, 51-53;)

According to Cantrell's interpretation of the Option and PGL and Majestic's *pro formas*, Majestic will receive potential fees (all of which are at market rate) in the amount of $153,339,398, plus repayment of advances with interest at 2.5 percent above prime rate, from gross revenues prior to the determination of net revenues. Total net revenues then paid to Majestic and the JAA, according to the Majestic *pro forma* is $898,880,645 for each.  Thus, Majestic projects that it will receive a total of $1,052,220,043, plus a return of all monies advanced plus interest; and JAA will receive $898,880,645, (plus return of the land and buildings after 80 or more years, which Majestic projects to be worth $754,200,000), according to Cantrell's analysis. (Tr. II at 31-53; 76-77; Ex. 11; PGL at 1, 12, ¶¶ 1.1, 1.7.2..)  Cantrell, however,

questioned the value of buildings 80 years hence, and said that in present-day value, they would be worth nothing.  Further, Cantrell testified that the net present value of $898 million (the JAA's projected 50 percent share of net profits over 65 years, and discounting the present value of the buildings to zero) is $5 million less than the present net value of cash flow over the same term if JAA was instead paid at a fair market lease rate of between $10,000 and $10,900 per acre per year.  (Tr. II at 51, 53, 94-98, 109-110.)

Jackson-Shaw regional development partner Thomas Jones supplied his own economic analysis of the JAA-Majestic transaction.  According to Jones, a commercial lease rate is normally based on the economic value of the land itself, determined as either the appraised value or the implied value.  The typical rate of return paid annually to the landowner is between 10 percent and 14 percent based on the market value of the property, with an adjustment to the lease rate every three to five years. (Tr. I at 70-71.)  According to Jones, because Majestic's land costs are zero, it will be able to sub-lease "their buildings for much less, say, anywhere from 60 to 80 cents per square foot less than a competing project."  (Tr. I at 79-80.)

According to Jones, Majestic projects its rental rate at $4 per square foot on the first building for the first year, which undercuts Tradeport, which has a first-year rental rate between $4.50 and $5.00 a square foot.  A second competing commercial development called Northpoint has stated lease rates in the range of $4.25 to $4.50.

40

(Tr. I at 80-81; Ex. 99 at 00115.)

Using Majestic's numbers, which show a total projected return on the first building of 10.13 percent, taking the $1,380 per acre rent figure, backing those figures out yields a per acre value of approximately $14,000 per acre value for the 328 acres at Woodwings East, according to Jones.  (Tr. 1 at 81-82; Ex. 99 at 00115.)  This compares to the $108,900 per acre that Jackson-Shaw paid for 46 acres of Tradeport in February 2005, and is considerably less than the per acre price of other parcels in the area, which range from $100,000 an acre to $283,000 (depending on size and location).  (Tr. I at 83-87.)

## II.   Discussion

### A.   Subject Matter Jurisdiction

In the week before trial, eight months after suit was filed, JAA for the first time, moved to dismiss the case contending that the Court lacked subject matter jurisdiction because Jackson-Shaw failed to meet its burden of establishing that it sustained damages in excess of $75,000, the jurisdictional amount in this diversity action. 22 U.S.C. § 1332.  (Doc. 72.)  In response, Jackson-Shaw submitted the affidavit of Michele Wheeler, its chief financial officer, in which she stated that based on her calculations, Jackson-Shaw's equity interest in Tradeport "will incur $565,464 in valuation losses" resulting from the JAA-Majestic agreement that is the subject of this case. (Doc. 73 at 9 ¶ 4 (Wheeler affidavit).)  Wheeler stated that if the JAA-Majestic

41

transaction is allowed to proceed, "Jackson-Shaw will be injured through Majestic's competitive advantage arising from its control of valuable public land at essentially no cost which enables Majestic to price space in its proposed warehouses on Woodwings East at lease rates below what its competitors (such as Jackson-Shaw, who must pay for its land) must charge . . . directly injur[ing] Jackson-Shaw through the loss of customers, commissions, fees and profits . . . . " (Id. at 9-10, ¶ 7.) The Court heard argument of counsel at the commencement of trial (Tr. I at 10-35), and determined that there was a sufficient legal and factual basis to support the Court's subject matter jurisdiction, subject to reconsideration upon receipt of the evidence at trial. (Tr. I at 35-44.)

At trial, Wheeler testified that, based upon her review of Majestic's financial projections as contained in its *pro formas* (Ex. 99), she believes that Majestic will directly compete with Jackson-Shaw's Tradeport industrial buildings. Because of the terms of the transaction between JAA and Majestic, Jackson-Shaw will suffer two types of injury: 1) injury incurred because Jackson-Shaw is precluded from bidding on and developing Woodwings East itself; and 2) injury incurred as a result of the terms favorable to Majestic. (Tr. II at 224-27.)

Wheeler focused on the Majestic *pro forma* which indicates the Majestic's Phase I land cost is zero dollars.   (See Ex. 99 at 00115). Assuming that Majestic would be able to charge a lower rent for its commercial and industrial buildings

because it did not have to pay for the land they are on, and that a market-rate rent is 10 percent of costs, Wheeler analyzed the impact of the transaction on Parcel 6 of Tradeport, a 25.32 acre parcel of land with 19.32 net buildable acres for which Jackson-Shaw paid $2,250,000, and which will be developed with 300,000 square feet of buildings.   Adding the cost of the land and the development, Wheeler calculated the total project cost for the 25-acre Parcel 6 at $15.4 million.  Ten percent of the $51.54 per square foot cost yielded a market rate rent of $5.16 per square foot, for a 10 percent return that is "generally accepted within the development community for a yield."  Then, to compare with what Majestic could charge for the same property under the terms of its transaction with the JAA, and still receive a 10 percent yield, Wheeler backed out the $2,250,000 cost of the land, leading to a per square foot rental rate of $4.40, assuming all of the same development costs as for Jackson-Shaw's Parcel 6 project.   The resultant valuation loss due to lower rental rates on Jackson-Shaw's 2.9 percent equity interest in sample Parcel 6, when compared to Majestic's posture for a comparable parcel, is $286,589, and a $9.38 a square foot loss in rental rates.   (Tr. II at 228, 234-44, 261; Exs. 210, 211.)

Extrapolating this calculated value loss on the Parcel 6 land and buildings ($9.38 a square foot),  and applying it to Tradeport's 85 acres, 67 acres of which are developable, results in a $9.5 million diminution in value as a result of the JAA-Majestic transaction on the land alone, plus a $9.3 million loss on the buildings.

Jackson-Shaw's equity interest in the property thus suffers a loss of $565,467 total injury on existing investment, according to Wheeler's calculations.  (Ex. 211.)  In addition, because rental rates will be reduced to compete with the projected lower rental rates Majestic can offer to sublessees, Jackson-Shaw's percentage-based operating and management fees and commissions will have to be similarly reduced to compete by $279,747.[21]  (Tr. II at 244-254; Ex. 211.)  Wheeler calculated that the total current and future losses in rent, building and property value, and fees to Jackson-Shaw attributable to the Majestic transaction with the JAA is $845,214.  (Ex. 211.)  "In order to meet what [Majestic is] going to be able to charge, I'm going to be competing with someone who doesn't have the same costs, that they receive their land for free.  So in order to meet the competition, I'm going to have to lower my rates."  (Tr. II at 241-44.)

Furthermore, according to Wheeler, Jackson-Shaw has already realized a market value loss to its Tradeport property because the Majestic transaction has been approved and signed by the JAA.  (Tr. II at 242.)

When a plaintiff seeks injunctive or declaratory relief, as Jackson-Shaw does here in Counts I through IV of its Second Amended Complaint,[22] "[t]he amount in

---

[21]    Adding together $226,841 in commissions plus $52,906 in property management fees lost.  (Ex. 211.)

[22]    Count V of the complaint seeks attorney's fees in conjunction with Jackson-Shaw's claim that the JAA violated Florida's public records law.  Ch. 119, Fla. Stat.

controversy is the monetary value of the object of the litigation from the plaintiff's perspective.'" <u>Federated Mut. Ins. Co. v. McKinnon Motors, Inc.</u>, 329 F.3d 805, 807 (11th Cir. 2003)(quoting <u>Cohen v. Office Depot, Inc.</u>, 204 F.3d 1069, 1077 (11th Cir. 2000)).  "A plaintiff satisfies the amount in controversy requirement by claiming a sufficient sum in good faith."  <u>Federated Mut. Ins. Co.</u>, 329 F.3d at 807.

> Generally, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." [<u>St. Paul Mercury Indem. Co. v. Red Cab Co.</u>, 303 U.S. 283, 289 (1938)].   However, where jurisdiction is based on a claim for indeterminate damages, the <u>Red Cab Co.</u> "legal certainty" test gives way, and the party seeking to invoke federal jurisdiction bears the burden of proving by a preponderance of the evidence that the claim on which it is basing jurisdiction meets the jurisdictional minimum.

<u>Federated Mut. Ins. Co.</u>, 329 F.3d at 807 (citation omitted).  Thus, a plaintiff must show that the injunction will produce benefits flowing to the plaintiff that are sufficiently measurable and certain to satisfy the amount in controversy requirement.  <u>Morrison v. Allstate Indemnity Co.</u>, 228 F.3d 1255, 1268 (11th Cir. 2000)("the value of the requested injunctive relief is the monetary value of the benefit that would flow to the plaintiff if the injunction were granted").

JAA opposes jurisdiction, relying primarily upon <u>Ericsson GE Mobile Communications, Inc. v. Motorola Communications & Electronics, Inc.</u>, 120 F.3d 216

---

Jackson-Shaw makes no credible argument that its attorneys' fees associated with that limited claim exceed the $75,000 threshold amount for jurisdiction.

(11th Cir. 1997), in which an unsuccessful bidder's action seeking declaratory and injunctive relief to enjoin execution of a contract between the city and the successful bidder was dismissed for lack of subject matter jurisdiction.  Noting that the action sought only to void the contract between the city and the successful bidder for violation of the Alabama Competitive Bidding Law, the court held that the value to the unsuccessful bidder of an injunction voiding the contract was not sufficiently measurable and certain to satisfy the amount in controversy requirement of the diversity statute.  Ericsson GE Mobile, 120 F.3d at 221-22.  "Any benefit that [plaintiff] could receive from the injunctive relief awardable by the district court - namely, the chance to rebid for the contract - is . . . too speculative and immeasurable to satisfy the amount in controversy requirement."  Id. at 221-22.

While Count I of Jackson-Shaw's second amended complaint may be analogous to the unsuccessful bidder's claim brought in Ericsson GE Mobile, Jackson-Shaw has brought other claims as well.  Count II alleges that the transaction between JAA and Majestic is in violation of Fla. Const. art VII, § 10, which prohibits a government entity from pledging credit to or entering into a joint ownership with a private corporation.  Jackson-Shaw alleges that the arrangement between the JAA and Majestic is unconstitutional and would enable Majestic to unfairly compete with Jackson-Shaw, and that as a "direct proximate result thereof, Jackson-Shaw will lose customers and profits and sustain actual financial injury."  (Doc. 65 at 7, ¶ 24.)

"When a business is threatened - by a regulatory statute, [or] by unfair competition . . . - the stated rule is that the amount in controversy is the difference between the value of the business if left unregulated, or not subjected to the improper competition, . . . and its value if the regulation is enforced, or with the competition . . . . Potential, as well as past harm to the company may be considered . . . ." 14B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3708 at 240-42 (3d ed. 1998). "In cases in which the plaintiff seeks to protect a business, the amount in controversy is the loss in profits to the plaintiff as a result of the regulation or alleged unfair competition . . . ." Id. at 243. "[S]o long as there is a 'present probability' that the damages will exceed the requisite amount, jurisdiction will be upheld." Id. at 244. See Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 346-48 (1977).

The former Fifth Circuit in Premier Industrial Corp. v. Texas Industrial Fastener Co., 450 F.2d 444 (5th Cir. 1971),[23] observed that "[t]he value to the plaintiff of the rights he is seeking to protect is the measure of jurisdiction in equity cases, even though the value of that right may not be capable of exact valuation in money." 450 F.2d at 446. The court held that the value of plaintiff's claim in equity to enforce a covenant not to compete, and thus the requisite amount in controversy, could be

---

[23]    In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

based upon the value of plaintiff's lost sales revenue because of the competing company, even though the amount was contested by the parties, plus the value of the future effect of the breach of the covenant not to compete. <u>Premier Industrial Corp.</u>, 450 F.2d at 447. "[A]lthough the value of the present and potential loss to [plaintiff] may be difficult of ascertainment, . . . it is clear that this loss is considerable and of sufficient amount to confer jurisdiction . . . ." <u>Id</u>. at 447.

Similarly, the court in <u>Viacom, Inc. v. Zebe</u>, 882 F. Supp. 1063 (S.D. Fla. 1995), also a suit for injunctive relief based upon an alleged violation of a covenant not to compete, held that the diversity case was "removable" to federal court because the value of the object of the litigation - enjoining defendants who are working for a competitor from violating an employment contract prohibiting disclosure of trade secrets - was clearly in excess of the minimum jurisdictional amount. 882 F. Supp. at 1065.

> "[T]he value of the right being protected or the injury being averted constitutes the amount in controversy when damages are not requested." [Citation omitted.] . . . "[A] complaint may reach the jurisdictional amount by including claims for losses that are difficult to quantify, such as competitive losses." [Citation omitted.] Further, these competitive losses need not have already occurred - potential as well as past damages are appropriate for consideration. . . . Thus, claims for injunctive relief must be measured in terms of the potential damages which such relief may prevent.

<u>Viacom</u>, 882 F. Supp. at 1064-65.

48

For purposes of determining the amount in controversy here, the object of Jackson-Shaw's claim is for Jackson-Shaw to continue its business enterprise at Tradeport in the vicinity of JIA and across the street from the Woodwings East parcel at issue here, free from what Jackson-Shaw alleges is unfair and unlawful competition from its competitor Majestic, which, Jackson-Shaw alleges, will have an unfair advantage because of the JAA-Majestic transaction. Jackson-Shaw, through its chief financial officer Wheeler, took just one term of the deal between JAA and Majestic - Majestic's free use of the land, which Majestic itself characterized in its *pro forma* as having zero cost - and applied that to Jackson-Shaw's neighboring parcel. Her undisputed analysis was that that fact alone would give Majestic a competitive advantage over Jackson-Shaw in leasing commercial space to businesses, resulting in in considerable projected current and future injury to Jackson-Shaw well beyond the Court's $75,000 jurisdictional amount. This "good faith" evidence is all that is necessary for Jackson-Shaw to prove the jurisdictional amount by a preponderance of the evidence. Federated Mut. Ins. Co., 329 F.3d at 807.

Ironically, JAA argues that the lease rates to be charged by Majestic to its future tenants at Woodwings East and whether Majestic will be successful in its endeavor is uncertain, rendering Wheeler's calculation of Jackson-Shaw's competitive losses speculative. (See Doc. 93 at 5-7.)   Yet, it is these very *pro formas* provided by Majestic with their projected lease rates, revenue successes and JAA's potential

49

return of net revenues over the 65 year term of the PGLs, that JAA uses to argue that the deal is sound.  Thus, Jackson-Shaw may use these same *pro formas* to calculate its worst-case potential competitive losses which create a "present possibility" that damages to Jackson-Shaw, which it seeks to prevent by this litigation, will exceed the jurisdictional amount of $75,000.

For these same reasons, Jackson-Shaw has demonstrated "injury-in-fact" sufficient to establish standing.  When the plaintiff seeks declaratory and injunctive relief, the following standing standards apply.

> First, the plaintiff must have suffered an "injury in fact," or "an invasion of a legally protected interest which is . . . concrete and particularized." [Citation omitted.]  Second, the plaintiff must demonstrate the existence of a causal connection between the injury and the conduct complained of, . . . and finally, it is necessary to establish that it is "'likely' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" [Citation omitted.]  Furthermore, where a plaintiff seeks prospective injunctive relief, it must demonstrate a "real and immediate threat" of future injury in order to satisfy the "injury in fact" requirement.

Focus on the Family v. Pinellas Suncoast Transit Authority, 344 F.3d 1263, 1272 (11th Cir. 2003).  See also GTE Directories Publishing Corp. v. Trimen America, Inc., 67 F.3d 1563, 1567 (11th Cir. 1995).  Here, based upon the affidavit and detailed testimony of Wheeler, Jackson-Shaw has established, beyond speculation, that if the agreement between JAA and Majestic is allowed to proceed, Jackson-Shaw faces a real and immediate *threat* of economic injury from the competitive disadvantage to

Jackson-Shaw resulting from that agreement.[24]

In its post-trial submission, JAA for the first time raised Jackson-Shaw's "standing" to challenge the Woodwings East transaction because it is a limited partner holding a 2.9 percent ownership interest in the building and land partnerships that own neighboring Tradeport.  (Doc. 93 at 2-4.)   Though phrased as a standing question, the Authority's thirteenth hour argument is more correctly characterized as a challenge to Jackson-Shaw's capacity to sue.  JAA's argument is misplaced.

First, Jackson-Shaw sues in its individual capacity and not derivatively on behalf of the Tradeport partnerships.  Jackson-Shaw has established the threat and likelihood of injury-in-fact not only to its ownership interest, but also to its commercial operational interest as manager of Tradeport sufficiently to establish its own standing resulting from and caused by the agreement between JAA and Majestic.  Second, even assuming that suit was brought on behalf of the Tradeport partnerships, which it was not, by not raising this issue in either its affirmative defenses, dispositive motions, or pre-trial statement, (see Docs. 10, 40, 60, 63), JAA has waived its right to challenge Jackson-Shaw's capacity to sue.  See Morgan Guaranty Trust Co. v. Blum, 649 F.2d 342, 344-46 (5th Cir. Unit B 1981); Lang v. Texas & Pacific Ry. Co.,

_____

[24]     Finding that Jackson-Shaw has standing to challenge the lawfulness of the agreement between the JAA and Majestic based upon the real and immediate threat of injury, the Court need not address JAA's argument that the company does not pay the City of Jacksonville sufficient taxes through its occupational license tax to qualify for "taxpayer standing."  (See Doc. 93 at 7-8.)

624 F.2d 1275, 1277 (5th Cir. 1980); Fed. R. Civil P. 9, 17.[25]

> **B.     Count I: JAA's Power to Enter Into an Agreement for Long-Term Use of Its Land Under Its Charter, Chapters 2004-464 and 2005-328, Laws of Florida**[26]

At issue is whether Chapter 2004-464, Laws of Florida, the JAA's Charter, requires it to seek competitive bids before entering into a contract with a private entity for long-term use of a 328 acre vacant parcel.  Jackson-Shaw characterizes the transaction as a "franchise," requiring competitive bidding "when practicable and when the interests of the authority will best be served."  2004 Fla. Laws 464, § 3(16).  JAA calls the transaction an option and a lease, and argues that, as a matter of law, it is not required to conduct competitive bidding prior to entering into a lease of real property.

Several portions of the JAA's Charter are relevant to determining whether the JAA must conduct competitive bidding before entering into a long-term contract concerning the Woodwings East Parcel.

Section 3 of Chapter 2004-464, which enumerates the "specified powers" of the JAA, provides that the JAA has the power:

---

[25]    The case <u>Bochese v. Town of Ponce Inlet</u>, 405 F.3d 964 (11th Cir.), <u>cert. denied</u>, 126 S.Ct. 377 (2005), relied upon by the JAA (Doc. 93 at 4–5), is inapposite.

[26]    The Court has diversity jurisdiction under 28 U.S.C. §1332.  A federal court sitting in diversity applies the substantive law of the state in which it sits.  <u>Ferrero v. Associated Materials, Inc.</u>, 923 F.2d 1441, 1444 (11th Cir. 1991).

(1)    . . . to enter into contracts, leases, or other transactions with any legal entity or person . . . .

and

(8)    [t]o make and enter into all contracts and agreements and to do and perform all acts and deeds necessary and incidental to the performance of the duties of the authority and the exercise of its powers; to make and execute leases or agreements for the use and occupation of the property and/or projects under the control of the authority on such terms, conditions, and period of time as it may determine; and to sell and dispose of such property and/or projects as shall no longer be needed for the uses and purposes of the authority on such terms and conditions as shall be prescribed by resolution of the authority . . . .

2004 Fla. Laws. 464, §§ 3(1) and 3(8)(emphasis added).

Jackson-Shaw cites to Section 3(16) of Chapter 2004-464, which provides that

the Authority has the power

(16)   To grant exclusive or non exclusive franchises to persons, firms or corporations for the operation of airport property or facilities, including restaurants, cafeterias, bars, cigar and cigarette stands, newsstands, buses, taxicabs, vending machines, hotels, motels, service stations, real estate developments, and other concessions in, on, and in connection with any property and/or project owned and operated by the authority.  In granting such franchises, it shall be the duty of the authority to investigate and consider the qualifications and ability of the lessee or concessionaires to provide or perform the contemplated services and the revenues which will be derived therefrom by the authority and to exercise sound prudent business judgment on behalf of the authority with respect thereto, calling for bids when practicable and when the interests of the authority will best be served by such action.

53

2004 Fla. Laws 464, § 3(16)(emphasis added).  Section 3 "Powers" also provides that

the Authority has the power

> (19)   To do all other acts and things necessary or proper
> in the exercise of the powers herein granted.
>
> (20)   To do all acts or things necessary or proper to be and
> serve as a local governmental body within the meaning of
> section 10(c)(2), Article VII of the State Constitution, with
> respect to any project as defined therein.

2004 Fla. Laws 464, §§ 3(19) and (20).  Additionally, the concluding section of the

Charter provides:

> Section 2.    The powers of the authority created by this act
> shall be construed liberally in favor of the authority.  No
> listing of powers included in this act is intended to be
> exclusive or restrictive and the specific mention of, or failure
> to mention, particular powers in this act shall not be
> construed as limiting in any way the general powers of the
> authority as stated in section 3.  It is the intent of this act to
> grant the authority full power and right to exercise all
> authority necessary for the effective operation and conduct
> of the authority.  It is further intended that the authority
> should have all implied powers necessary or incidental to
> carrying out the expressed powers and the expressed
> purposes for which the authority is created. . . .

 2004 Fla. Laws 464, § 2 (emphasis added).

    "In the absence of specific constitutional or statutory requirements, a public

agency has no obligation to establish a bidding procedure and may contract in any

manner not arbitrary or capricious." Volume Services Div. of Interstate United Corp.

v. Canteen Corp., 369 So.2d 391, 395 (Fla. 2d DCA 1979).  Thus, unless specifically

required by law, competitive bidding "is not an essential prerequisite to the validity of public contracts." Randall Industries, Inc. v. Lee County, 307 So.2d 499, 500 (Fla. 2d DCA 1975).  Therefore, the question here is whether JAA's Charter required bidding before the JAA could enter into an agreement such as the one it reached with Majestic.

1.    Franchise or Lease

A "franchise" is defined as "a special privilege conferred upon one or more individuals or a corporation by governmental authority to do something that cannot be done of common right." Landis v. Rosenthal, 148 So. 769, 769 (Fla. 1933); see also City of Mt. Dora v. JJ's Mobile Homes, Inc., 579 So.2d 219, 223-24 (Fla. 5th DCA 1991)(franchise is "'a special privilege conferred by the government on individuals or corporations that does not belong to the citizens of a country generally by common right'").  Franchises "are permitted to be used for the good of the public, usually for the purpose of rendering an adequate service without unjust discrimination, and for a reasonable compensation." Leonard v. Baylen Street Wharf Co., 52 So. 718, 718 (Fla. 1910)  Franchisees are charged "fees" which "'are bargained for in exchange for specific property rights relinquished by the [government entity].'" Alachua County v. State, 737 So.2d 1065, 1068 (Fla. 1999).

The court in West Coast Disposal Service, Inc. v. Smith, 143 So.2d 352 (Fla. 2d DCA 1962) defined a "franchise" as follows:

55

> The holder of a franchise, in the commercial sense here involved, generally performs functions of a *quasi* governmental nature in that such a franchise is the privilege of engaging under governmental authority in that "which does not belong to the citizens . . . generally by common right." [Citation omitted.] It is a contract with a sovereign authority by which the grantee is licensed to conduct such a business within a particular area and it may prohibit others from engaging in the same business within the prescribed area for a given period of time.

143 So.2d at 353 (exclusive franchise to collect garbage in specified area of county).

Examples of franchises generally relate to a specific quasi-governmental commercial privilege granted by the sovereign.  See State v. Georgia Southern & Florida Ry. Co., 190 So. 527 (Fla. 1939)(franchise to operate rail line over a certain route); Landis, 148 So. at 769 (the right to establish and maintain a toll bridge is a "franchise"); Day v. City of St. Augustine, 139 So. 880, 883 (Fla. 1932)(privilege of establishing a bridge over a navigable river and taking tolls is a franchise); Leonard, 52 So. at 719 (right to construct a wharf at termination of city street);  City of Mt. Dora, 579 So.2d at 223-24 (private company granted a certificate by the Public Service Commission to provide water and sewer service was granted a privilege referred to as a franchise); West Coast Disposal Service, Inc., 143 So.2d at 352 (company granted exclusive franchise to collect garbage in specified area of the county).

A "lease," on the other hand, involves "'a conveyance by the owner of an estate to another of a portion of his interest therein for a term less than his own [which] passes a present interest in the land for the period specified.'" Outdoor Media of

56

Pensacola, Inc. v. Santa Rosa County, 554 So.2d 613, 615 (Fla. 1st DCA 1989)(citation omitted).  More precisely, a "lease" is a

> "Contract for exclusive possession of lands or tenements for determinate period.  Contract for possession and profits of lands and tenements either for life, or for certain period of time, or during the pleasure of the parties. . . . Conveyance of interest in real property for specified period or at will.  Conveyance or grant of estate in real property for limited term with conditions attached.

Outdoor Media of Pensacola, Inc., 554 So.2d at 615 (quoting Black's Law Dictionary 829 (5th ed. 1979).  In Outdoor Media, the court held that an agreement by which a county passed a portion of its interest in property for a specified period to a corporation authorizing the corporation to use county land for the placing of signs was a lease. "In other words, [the corporation] has been granted more than a privilege to go on the land.  Instead, it has been granted use of a portion of the land for the duration of the agreement."  Outdoor Media, 554 So.2d at 616.

Florida courts have held that "the leasing of land or publically owned facilities for the private or business purposes of the leaseholder serves a 'public purpose.'" Furnams v. Santa Rosa Island Authority, 377 So.2d 983, 987 (Fla. 1st DCA 1979)(authority not required to competitively bid lease of land).  See also Rolling Oaks Homeowner's Ass'n v. Dade County, 492 So.2d 686, 688 (Fla. 3d DCA 1986)(Florida courts approve the use of public land by private enterprise if the public interest or benefit is significant enough).

Publically owned property acquired for airport purposes, which in the judgment of the governing body is not required for aeronautic purposes, may be leased. Section 332.08(4), Florida Statutes.  Though not applicable to the JAA, which is governed by its Charter, <u>see</u> <u>Furnams</u>, 377 So.2d at 987 (inasmuch as authority is governed by the provisions of the special acts that control it, authority not required to advertise for bids to lease property under provision requiring counties to do so), Section 332.08(4) evinces the state Legislature's recognition that airports can properly lease its nonaeronautical land.  <u>See also</u> <u>Weekly Planet, Inc. v. Hillsborough County Aviation Authority</u>, 829 So.2d 970, 972 (Fla. 2d DCA 2002)(aviation authority acting pursuant to its charter created by special act of the legislature, entered into 85-year lease of 150 vacant acres of "raw land" adjacent to airport with private developer that "basically transfers control" of the property to developer who will own the improvements to the land during the term of the lease).[27]

The agreement between JAA and Majestic is a conveyance of JAA's present interest in the land for a period specified for use by Majestic during that period.  It is

_____

[27]     Long-term leases by airports, either owned by a municipality or county, or by an authority created by special act of the Legislature, are discussed in cases relating to ad valorem taxation of airport property.  <u>See</u> <u>Hillsborough County Aviation Authority v. Walden</u>, 210 So.2d 193, 195 (Fla. 1968)(property leased for a term of 99 years for a motel); <u>City of Bartow v. Roden</u>, 286 So.2d 228, 229-30 (Fla. 2d DCA 1973)(property not directly involved with aviation leased to private interests as an industrial park for activities unrelated to aviation with all income derived from the leases used by the airport authority).

not a grant of a right to "operate" JAA property.  Cf. Rolle v. City of Miami, 408 So.2d

642, 643 (Fla. 3d DCA 1981)(city grants franchise "on" its property and lease "of" city

property).   Furthermore, Majestic's proposed development of the property is not a

"quasi governmental" function, service or privilege, such as collection of garbage,

operation of a utility, provision of a wharf or toll bridge, or even providing a news stand

or taxicab at the airport.  Rather, under the Option and PGL, Majestic agrees to

"cause the development, construction, maintenance, leasing, management and

operation of commercial real estate buildings and other improvements" on the

Woodwings East property for sub-lease to third party tenants.  (Ex. 214 at 1 (PGL))

Jackson-Shaw expert witness Charles Allen Watts[28] cites the broad definition

of "project" in the JAA charter, as including "warehouses" and "other facilities" which

all support the JAA's mission, (Tr. III at 29-31 (citing 2004 Fla. Laws 464, §

2(6)("Definitions")), coupled with Section 10 of the Charter, 2004 Fla. Laws 464, § 10

("Award of contracts"), which he says provides a "limitation on the exercise of this

power to engage in projects . . . which requires that when the aviation authority itself

is going out to engage in all of these projects [including "warehouses"and "other

facilities"] it's got a competitive bidding requirement."  (Tr. III at 31.)  Because the JAA

has the power under its Charter to construct warehouses, it may choose not to

exercise that power, and instead, grant the entrepreneurial opportunity  to develop

---

[28]     The Court accepts Watts as an expert in Florida municipal law.

land and build warehouses to a third party via a "franchise," which must be competitively bid under Section 3(16), according to Watts.  (Tr. III at 32-36.)  Watts contends this interpretation is further buttressed by the fact that Section 3(16) addressing the Authority's power to grant franchises is the only place in the charter mentioning "real estate developments," while the provisions recognizing the Authority's power to enter into leases does not include "real estate developments." Thus, under Jackson-Shaw's analysis, if the Authority engages in a real estate development on its own, "it's a project.  If it grants that entrepreneurial opportunity to another, it is a franchise, because the legislature defined real estate development as being a species of franchise." (Tr. III at 81 (Watts).)  According to Jackson-Shaw, any agreement with the Authority to develop the JAA's nonaeronautical land is a franchise because it provides a "service" that is "symbiotic" with the operation of an airport." (Tr. III at 37, 58 ("a real estate development is a franchise"); Doc. 94-2 at 46.)

Section 3(16) of the JAA Charter enumerates the Authority's power "[t]o grant exclusive or nonexclusive franchises" to third parties "for the operation of airport property or facilities, including" an enumerated list of items such as restaurants, cigar and cigarette stands, hotels, service stations "real estate developments and other concessions in, on, and in connection with any property and/or project owned and operated by the authority."  In exercising its power to grant franchises, the Authority is to call for bids "when practicable" and "when the interests of the authority will best

be served by such action." 2004 Fla. Laws 464 § 3(16)(emphasis added). Section 10 of the Charter requires the Authority to competitively bid "[i]f the total cost, value, or amount of construction, reconstruction, repairs, or work of any nature, including labor and materials, exceeds $50,000 when purchased by the authority."

In construing Chapter 2004-464, the Court is mindful that a "'statute should be interpreted to give effect to every clause in it, and to accord meaning and harmony to all of its parts,' [Citation omitted.] Accordingly, 'statutory phrases are not to be read in isolation, but rather within the context of the entire section.'" Jones v. ETS of New Orleans, Inc., 793 So.2d 912, 914-15 (Fla. 2001). Further, courts should avoid readings that would render any part of a statute meaningless. Koile v. State, 934 So.2d 1226, 1231 (Fla. 2006). Additionally, courts may not insert words or phrases in a statute that to all appearances were not in the mind of the legislature when the law was enacted. Rebich v. Burdine's and Liberty Mut. Ins. Co., 417 So.2d 284, 285 (Fla. 1st DCA 1982).

Nothing in the Charter's Section 2(6) definition of "project," Section 10 addressing "bidding requirements," or Section 3(16)'s description of the JAA's power to grant franchises changes the fact that the JAA has the power to enter into leases, which may include long-term leases, "for the use and occupation of the property . . . under the control of the authority," 2004 Fla. Laws 464, §§ 3(1) and (8), and that the JAA's power to lease is not qualified in any way by a statutory requirement to

advertise for bids.   Jackson-Shaw is unable to cite to any competitive bidding requirement which would otherwise be applicable to the leasing of JAA property; rather, it would graft the Sections 3(16) and 10 competitive bidding language onto JAA's enumerated power to lease by contending that "land development" on this particular piece of property is a unique "entrepreneurial opportunity" and privilege for which JAA can only contract by "franchise."  Compare Randall Industries, Inc., 307 So.2d at 501 (Chapter 125 pertaining to counties requires the county-owned airport to competitively bid the long-term lease of county property to taxi company) with Furnams, 377 So.2d at 987 (there is no provision requiring advertising for bids before the authority, which is governed by special act of the Legislature, can enter into leases).  Jackson-Shaw's reading of the Charter would render meaningless Sections 3(1) and (8) recognizing JAA's power to lease its property (with no mention of competitive bidding), in contravention of concluding Section 2 of the Charter which cautions that specific mention of a particular power, such as the power to enter into franchises, 2004 Fla. Laws 464 § 3(16), does not limit, in any way, the general powers of the JAA as stated in Section 3, Id. at 264, § 2, and is contrary to the rules of statutory construction.[29]

The legal distinction between "lease" and "franchise" is borne out by the

---

[29]   The testimony of JAA's expert, Professor Stephen Durden, emphasized the broad powers of JAA under its Charter.

Charter's characterization of franchise.   Section 3(16), which provides that the Authority has the power to grant "franchises to persons, firms, or corporations for the operation of airport property or facilities . . . ," and the duty to investigate and consider the qualifications and ability of lessees or concessionaires "to provide or perform the contemplated services." 2004 Fla. Laws 464 §1(3)(16) (emphasis added).  Majestic has not contracted to "operate" the JAA's real estate development or to perform a "service." Rather, it has acquired the present interest to use the JAA's land for a term of years in return for rent paid.  The PGL is a conveyance of interest in real property at Woodwings East for a specified period of time with conditions attached; under both general law and the JAA Charter it is a lease and not a franchise.

2.      "Sound Prudent Business Judgment"

Alternatively, assuming arguendo that the Woodwings East transaction at issue here is a "franchise," the Authority has a duty to exercise "sound prudent business judgment," which involves "calling for bids when practicable and when the interests of the authority will best be served by such action." 2004 Fla. Laws 464, § 3(16).

The hortatory language of Section 3(16)'s reference to bidding franchises "when practicable" and in the best interests of the JAA is to be contrasted with the mandatory language found in Section 10 of the Charter, setting forth a "requirement for competitive bidding" that the Authority "shall" comply with in contracting for construction or repairs, including labor and materials, that exceed $50,000.  2004 Fla.

Laws 464, § 10(1).

Jackson-Shaw argues that JAA's failure to determine the fair market value of the Woodwings East property; to more extensively market the availability of the property for lease; to establish internal investment criteria against which to measure proposals from developers; to investigate or confirm Majestic's financial representations and projections for the project; and to mistakenly presume that no other developers were interested in the property, is evidence of the Authority's failure to exercise sound business judgment.  (<u>See</u> Doc. 94-2 at 49-55.)

When discretion is conferred by law on a public officer, "[t]he officer when exercising the discretion is not permitted or allowed to act in an arbitrary or capricious manner.  He is not permitted to exercise the discretion conferred by law for personal, selfish or fraudulent motives or for any reason or reasons not supported by the discretion conferred by law."  <u>State ex rel. Roberts v. Knox</u>, 14 So.2d 262, 170-71 (Fla. 1943). <u>See also</u> 93 Fla. Op. Att'y Gen. 28, 1993 WL 361733, at *1 (1993)(Ocean Highway and Port Authority, created by special act, not required to competitively bid contract for legal service and was required as a public body only to act in good faith and in the best interests of the public).

 Where an act by a government body is within the power of that body, the enactment "is presumed to be reasonable, unless its unreasonable character appears on its face."  <u>City of West Palm Beach v. Williams</u>, 291 So.2d 572, 575 (Fla. 1974).

The government agency's exercise of its discretion with regard to competitive bids for a public contract "cannot be overturned absent a finding of 'illegality, fraud, oppression or misconduct.'" Department of Transportation v. Groves-Watkins Constructors, 530 So.2d 912, 913 (Fla. 1988).

> So long as the public agency acts in good faith, even though they may reach a conclusion on facts upon which reasonable men may differ, the courts will not generally interfere with their judgment, even though the decision reached may appear to some persons to be erroneous.

Volume Services Division, 369 So.2d at 397.  Accord Groves-Watkins, 530 So.2d at 913 (noting the "strong judicial deference accorded to an agency's decision in competitive bidding situations").[30]

The evidence at trial established that the Woodwings East property was marketed, albeit not extensively; that the marketing did attract an interested developer; that JAA determined Majestic's proposal to be consistent with the Authority's goal to expand and diversify its sources of revenue; that JAA determined the transaction would be advantageous to the Authority and would raise significant revenue for the Authority's operations in the future; and that the proposed transaction would put to use and make productive property that had sat vacant for years.  With

---

[30]    Cf. In re Bal Harbour Club, Inc., 316 F.3d 1192, 1195 (11th Cir. 2003)(under the "business judgment rule" which applies to corporate boards of directors, "'courts presume that directors have acted in good faith. A court will not call upon a director to account for his action in the absence of a showing of abuse of discretion, fraud, bad faith or illegality'" (citation omitted)).

the exception of committing the use of 328 acres of its land for up to 80 years, the

Authority determined it will be exposed to no risk of loss or out of pocket expenses

now or in the future other than spending $750,000 to build a public road, which it had

already approved and budgeted for, and providing up to 50 acres of wetlands

mitigation for property in which it retains a fee ownership interest.  In return, the

Authority believes that it will realize significant revenues in the future from the

proposed commercial development, and that Majestic's incentive to earn a profit itself,

coupled with the company's experience and national track record, will ensure the

success of the project.  While the evidence disclosed potential weaknesses with

JAA's expertise, evaluation and analysis of the Majestic transaction, and while

reasonable persons may disagree with the procedures followed by the Authority, and,

indeed, with its ultimate decision, in the absence of any evidence of illegality,[31] fraud,

---

[31]     Jackson-Shaw's post-trial attempt to bootstrap an argument that the Majestic transaction was "illegal" and in violation of Florida's Government in the Sunshine Law, Fla. Const. art. I, § 24; Fla. Stat. § 286.011(1), because JAA staff and Majestic executives met *seriatim* with JAA Board members in November 2005, before the Majestic proposal was presented to the board in a public meeting, (Tr. I at 177-78; Tr. II at 159-61; Tr. III at 164-66; Tr. IV at 32-34; Ex. 92; <u>see</u> Doc. 94-2 at 56-60), fails to establish that the JAA's action in not seeking bids for the Woodwings East agreement was arbitrary and capricious. There was no testimony or evidence that the JAA Board members shared communications with each other via the single meetings or agreed to any course of action.  The Authority members were briefed individually once about the deal. <u>Contrast</u> <u>Blackford v. School Bd. of Orange County</u>, 375 So.2d 578 (Fla. 5th DCA 1979)(six *seriatim* sessions with individual board members concerning school redistricting constituted violation of Sunshine Law such that entire redistricting issue required to be re-discussed in an open public meeting).  Further, the Board met in open and noticed public meetings

oppression or misconduct, the JAA's determination not to call for bids or request proposals before entering into the deal with Majestic is not arbitrary and capricious and cannot be overturned.

### C.   Count II: The Florida Constitution's Prohibition Against Joint Ownership and Giving Public Credit To Aid A Private Corporation, Fla. Const. art. VII, § 10

Jackson-Shaw alleges in Count II of its complaint that the transaction between the JAA and Majestic violates Article VII, Section 10 of the Florida Constitution because the Authority, a public body, is either a joint owner of the project with Majestic, or improperly lends its public credit and funds to Majestic without a paramount public purpose and with more than an incidental benefit to Majestic. (Doc. 65 at 6-7, ¶ 22.)

––––––––––––––––––

in December 2005 and September 2006 at which the Majestic transaction was presented and discussed by the board members and at which the public had the right to speak, constituting more than a perfunctory ceremonial ratification.  A full and open hearing, with final action completely in the Sunshine, will cure any defect arising from a Sunshine Law violation.  Tolar v. School Bd. of Liberty County, 398 So.2d 427, 429 (Fla. 1981).

Jackson-Shaw's contention that the Authority acted arbitrarily and capriciously by voting to permit JAA executive director Clark to be "authorized to make such changes [to the Option and PGL], and to enter into all other agreements related thereto necessary to implement the planned development of Woodwings East," as an improper delegation of the Board's decision-making authority subject to the Sunshine Law (Doc. 94-2 at 58 (citing Ex. 196)) also falls short.  The Board approved the transaction on September 18, 2006, authorizing Clark to execute the Option, which he did on October 9, 2006, without apparent material changes.  (Tr. III at 188; Exs. 213, 214.)

Article VII, Section 10 of the Florida Constitution, entitled "Pledging credit," provides, in relevant part:

> Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person . . . ."

Fla. Const. art. VII, § 10.[32]  This provision has two components: "joint owner with, or stockholder of," which is absolutely forbidden; and giving, lending or using of public credit or taxing power to aid a private corporation, which is also prohibited unless there is "paramount public purpose."

Article VII, Section 10 of the 1968 Florida Constitution was preceded by Article IX, Section 10 of the state's constitution of 1885.  That provision prohibited counties, cities and districts in the state from becoming stockholders in, obtaining or appropriating money for, or in any way loaning their credit to any corporation, association, institution, or individual.  Bailey v. City of Tampa, 111 So. 119, 119 (Fla. 1926).  See also Herr v. City of St. Petersburg, 114 So.2d 171, 173-74 (Fla. 1959). The Florida Supreme Court recounts the provision's history and purpose as follows:

> Section 10 of article 9 of our organic law was first adopted in 1875 as an amendment to section 7 of article 13 of the Constitution of 1868.  The reason for this amendment was that, during the years immediately preceding its adoption,

---

[32]    This provision lists four exemptions from its prohibitions which are inapplicable here.

the state and many of its counties, cities, and towns had by legislative enactment become stockholders or bondholders in, and had in other ways, loaned their credit to, and had become interested in the organization and operation of, railroads, banks, and other commercial institutions. Many of these institutions were poorly managed, and either failed or became heavily involved, and, as a result, the state, counties, and cities interested in them became responsible for their debts and other obligations. These obligations fell ultimately on the taxpayers. Hence the amendment, the essence of which was to restrict the activities and functions of the state, county, and municipality to that of government, and forbid their engaging directly or indirectly in commercial enterprises for profit.

Bailey, 111 So. at 120. See also State v. Jacksonville Port Authority, 204 So.2d 881, 882 (Fla. 1967). The provision was designed "to keep the State out of private business; to insulate State funds against loans to individual corporations or associations and to withhold the State's credit from entanglement in private enterprise." Dade County Bd. of Public Instruction v. Michigan Mut. Liability Co., 174 So.2d 3, 5-6 (Fla. 1965). The Constitution's prohibition extended to corporations in private business as well as to corporations performing a public service such as railroads. Herr 114 So.2d at 173-74.

"When the 1968 Constitution was adopted, the rule of the 1885 Constitution relating to the advancing of public credit to aid private persons was continued," with the exception that the new provision specifically exempted local revenue bonds to finance the cost of capital projects for industrial or manufacturing plants and airports and ports. Orange County Industrial Dev. Authority v. State, 427 So.2d 174, 176-77

69

(Fla. 1983).  "[T]he 1968 revision of the State Constitution did not enlarge the limitations of the 1885 State Constitution with reference to the lending or pledging of the taxing power or credit of a public body to aid a private corporation or person.  To the contrary, such limitations were relaxed for airports, port facilities, and industrial or manufacturing plants."  State v. Inter-American Center Authority, 281 So.2d 201, 203 (Fla. 1973).

More recently, and subsequent to Florida's adoption of its 1968 Constitution, the Florida Supreme Court has characterized the purpose of Article VII, Section 10 as being "to protect public funds and resources from being exploited in assisting or promoting private ventures when the public would be at most only incidentally benefitted."  Bannon v. Port of Palm Beach District, 246 So.2d 737, 741 (Fla. 1971). "The purpose of the constitutional prohibition against a municipality [or other government entity] owning corporate stock is to protect public funds and resources from exploitation by private for-profit ventures with only incidental benefits to the public."  In re General Development Corp., 135 B.R. 1002, 1005 (S.D. Fla. 1991)(citing Florida cases).  The provision "acts as a check against voluntary acts by public officials to invest public funds or commit the credit of a municipality for private benefit at the public expense."  Id.

1.     Power To Lease Public Land To Private Corporation[33]

Without dispute, the JAA has the *power* to lease its nonaeronautical land.  2004

Fla. Laws 464, §§1(1); 3(1)(8)(19) and (20).   Thus, it is not "necessary to determine

whether the purposes to be served by the development of the leased property are

primarily public or private in nature," inasmuch as the Authority, by leasing the

property in question, was exercising a power conferred on it by its Charter.  Bannon,

246 So.2d at 740.  Where bonds are not issued, public funds are not spent, and the

power of eminent domain is not exercised, a public entity, such as the JAA,

empowered by the Legislature with the authority to lease its property, may lease

public land for private uses in accordance with its legislative authority.  City of West

Palm Beach, 291 So.2d at 578.   "[A]though the use may be for purely private

purposes, the leasing of the property may nevertheless constitute a valid public

purpose."  Furnams, 377 So.2d  at 987.[34]  Thus, the *fact* of a long-term option and

———————————————

[33]     JAA and Majestic intended that the PGL be characterized as a lease and not
a partnership.  (Ct. Ex. 1 at 108; Ct. Ex. 6 at 78-79; PGL at 4, ¶ 1.1.23; 9, ¶ 1.1.49;
20, ¶ 2.5; 42, ¶ 3.17.)   That earlier drafts of the Option made reference to the
transaction being a "joint project" does not change the Court's analysis; it is the
form and substance of the arrangement that controls, not its name.

[34]     See also Koubek v. Caufield, 213 So.2d 417 (Fla. 1968)(city had authority
to spend public money to acquire downtown property and to enter into a long term
contract for the erection and lease of a parking facility thereon without
contravening the Florida constitution); Sunny Isles Fishing Pier v. Dade County, 79
So.2d 667 (Fla. 1955)(county's 30-year lease of oceanfront property to a private
entity to construct and operate a fishing pier, and providing for an annual rent of
five percent of the gross receipts with a guaranteed minimum rent, and that upon

lease between the JAA and Majestic is not, per se, a violation of Article VII, Section 10.  However, whether the specific terms of the Option and PGL are such that the agreement violates the prohibitions of Article VII, Section 10 is the issue.

      2.   "Joint Ownership"

Jackson-Shaw characterizes the Option and PGL agreement as creating a "joint venture," and asserts that "[a]s a joint venturer, the JAA is an owner of the joint enterprise with Majestic as a matter of law," which constitutes an unlawful "joint ownership between the JAA and a private business."  (Doc. 94-2 at 33-36.)  Jackson-Shaw contends that the transaction is a joint venture for two reasons: 1) the JAA and Majestic share in the net profits and losses; and 2) the very structure of the deal is evidence of a joint venture.[35]

---

termination of the lease, the improvements would become the property of the county, was a proper exercise of the county's power); Rolling Oaks Homeowner's Ass'n, Inc. v. Dade County, 492 So.2d 686, 688 (Fla. 3d DCA 1986)(county may enter into 99-year lease of land with private corporation for sports stadium inasmuch as the use of public property as a sports stadium has been approved as a use for a public purpose); Furnams, 377 So.2d at 987(special act creating Santa Rosa Island Authority authorized its leasing publically owned island property to private entities for the purpose of recreational, residential and business uses in the "public interest").

[35]    The Option, standing alone, does not establish a joint venture, inasmuch as Majestic is not obligated to do anything.  Although it has the right to improve the property at its own expense, it is not obligated to do so, nor is it obligated to exercise the Option.  See Russell v. Thielen, 82 So.2d 143, 144 (Fla. 1955).  It is Majestic's exercise of the Option in combination with the PGL that leads to the sharing of net revenues, and thus the question of whether a "joint ownership" is created contrary to Article VII, Section 10.

Jackson-Shaw relies upon Opinion 2002-07 of the Florida Attorney General, which advised that a "partnership" in which a city and a private corporation split net profits from the delivery of natural gas service to the city's residents was violative of Article VII, Section 10. 2002 Fla. Op. Att'y Gen. 07, 2002 WL 76762 (2002). "Rather than the city imposing a franchise fee, the corporation has proposed a partnership whereby the city would share in the net revenues." Id., 2002 WL 76762, at * 1. The Attorney General advised that "[g]iven the express prohibition against a city's becoming a joint owner or stockholder in any corporation, with the exception of an electrical generating facility, the City . . . may not enter into a partnership with a private corporation for the delivery of natural gas service to its residents." Id. at * 2. Jackson-Shaw expert Watts testified that in his opinion, it is the sharing of "net" revenues, rather than of gross revenues which makes this transaction unconstitutional. According to Watts, splitting gross revenue is a way of adjusting the entrepreneurial opportunity granted the private corporation, repricing the franchise if unexpected revenues are received. Sharing "net revenue," however, makes the government a "partner" sharing in the profits. (Tr. III at 48-49.)

As to its second argument, Jackson-Shaw contends the Option agreement between the JAA and Majestic is a joint venture because "the transaction is structured such that JAA contributes its land, its capital for wetlands mitigation, and its capital for road construction, and Majestic contributes principally its real estate development

73

expertise - all toward a venture to develop Woodlands East into a profitable industrial park."  (Doc. 94-2 at 34.)

"A partnership is created only where 'both parties contribute to the labor or capital of the enterprise, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business.'" Williams v. Obstfeld, 314 F.3d 1270,1275 (11th Cir. 2002)(citing Florida law; citation omitted).  A joint venture, while similar to a partnership arrangement, is more limited in scope.  Kislak v. Kreedian, 95 So.2d 510, 514-15 (Fla. 1957).   A contractual relationship creating a "joint venture" must consist of all of the following elements: (1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits and duty to share losses; and (4) joint control or right of control.  Williams, 314 F.3d at 1275-76.  "To share in losses means that each party is responsible or liable for the losses created by the venture and is exposed to liability, if any, to creditors or third parties."  S & W Air Vac Systems, Inc. v. Dept. of Revenue, 697 So.2d 1313, 1316 (Fla. 5th DCA 1997).[36]  Further, inherent in joint ventures "is the right and the authority of any one of the co-adventurers to bind the others with reference to the subject matter of the co-adventure."  Kislak, 95 So.2d at 516; see also Pinnacle Port

---

[36]     In this vein, "[p]articipants in a joint venture are each liable for the torts of the other or of the servants of the joint undertaking committed within the course and scope of the undertaking, without regard to which of the joint venturers actually employed the servant." Florida Tomato Packers, Inc. v. Wilson, 296 So.2d 536, 539 (Fla. 3d DCA 1974).

Community Ass'n. v. Orenstein, 872 F.2d 1536, 1539 (11th Cir. 1989)("[i]n a joint

venture, a form of partnership, one joint venturer can bind the others in matters within

the scope of the joint enterprise").   "Florida courts have interpreted these

requirements to preclude a finding that a partnership or joint venture exists where any

factor is missing."   Williams, 314 F.3d at 1276; see also USA Independence

Mobilehome Sales, Inc. v. City of Lake City, 908 So.2d 1151, 1158 (Fla. 1st DCA

2005).

> The court in  Williams, supra, observed that

>> In certain situations, where one party supplies labor and
>> skill, and the other supplies capital, and both agree to share
>> in the profits of the venture, Florida courts have concluded
>> an agreement to share losses exists as a matter of law
>> "since in the event of a loss, the party supplying the know-
>> how would have exercised his skill in vain and the party
>> supplying the capital investment would have suffered a
>> diminishment thereof."

Williams, 314 F.3d at 1276 (citation omitted); see also Russell v. Thielen, 82 So.2d

143, 146 (Fla. 1955); Florida Tomato Packers, Inc. v. Wilson, 296 So.2d 536, 539

(Fla. 3d DCA 1974).

> The sharing of net revenues, without more, does not create a joint venture

when the other elements of joint venture are not satisfied.  For example, in Conklin

Shows, Inc. v. Department of Revenue, 684 So.2d 328 (Fla. 4th DCA 1996), the court

held that agreements between Conklin, a company engaged in the business of

providing midway attractions for fairs, and the various ride operators and

concessionaires did not create joint ventures for sales tax purposes, even though the

contracting entities shared net proceeds from game receipts.  684 So.2d at 331-32.

> Here, [Conklin] did not contribute capital for operating
> expenses, nor did it contribute services or materials; it
> merely contributed the right to use the land.  With regard to
> the joint control aspect of a joint venture, [Conklin] failed to
> demonstrate mutual control over actual running of the
> games, hiring of personnel, maintenance, and collection of
> money.    In  fact,  the  record  shows  the  games
> concessionaires had exclusive control over the games
> operations.

Conklin Shows, Inc., 684 So.2d at 332.  Further, there was no evidence establishing

"a mutual intent to bind each other for any liabilities incurred as a result of the

operations."  Id. at 333.  Cf. Gay v. Supreme Distributors, Inc., 54 So.2d 805 (Fla.

1951)(tavern owner receiving percentage of gross revenue from juke boxes as rent

in return for the right to have them installed on tavern property did not enter into joint

venture with juke box operator); Coral Gables Secs. Corp. v. Miami Corp., 166 So.

555, 557 (Fla. 1936)(fact that vendor of property to receive a "bonus" payment of

percentage of net profits from purchaser's development as part of purchase price

does not create a joint venture even though vendor retained privilege of approving

plans and jointly selected auditor);  S & W Air Vac Systems, Inc., 697 So.2d at 1316

(fact that agreement between owner of coin operated machines for vacuuming

automobiles and filling tires and convenience and service stations provided that the

service stations would receive a percentage of gross receipts from the machine did

not create a joint venture; machine owner maintained exclusive control over the machine except for its location on the service station property and service station did not share in the risk of loss).  Compare Florida Tomato Packers, Inc., 296 So.2d at 539 (jury question as to existence of joint venture created where company that paid all farming bills, and farmer shared net profits after deducting all costs paid).

Further, Florida law provides that a lease agreement between two parties does not create a partnership between them simply because the lessor receives a share of the profits of a business in payment of rent. Fla. Stat. § 620.8202(3)(c)3 (2006)(Florida's "Revised Uniform Partnership Act of 1995").  The Partnership Act provision is reflected in earlier Florida case law.  In Ball v. Yates, 29 So.2d 729 (Fla. 1946), in holding that an oil lease was not a joint adventure, the court observed:

> The lessor's interest was in receiving his rent of 10 cents per acre or else that of having wells drilled for oil on his land and receiving a portion of the oil as rent.  The lessee's interest was in having the privilege of taking oil and gas from [the lessor's] land.  There was not joint or mutual interest.  The lessee was to pay and the lessor was to receive. Their interests were adverse and not joint . . . ; but of course they both wanted oil and gas but there is none and even if oil were produced their interest would be separate and not joint.

29 So.2d at 734.

Likewise, in Brown v. Snellgrove, 503 So.2d 447 (Fla. 2d DCA 1987), a lessor under a cash farm lease was not a joint venturer with lessee where lease provided that lessor was to receive one-third of the net profits from the farming operation; the

lessee was responsible for all expenses except maintenance of the fence, payment of real property taxes, and insurance on existing buildings.  The lessor was not obligated for any losses, and had no right to control the lessee's farming operation.  See also Phelps v. Gilbreth, 68 So.2d 360, 362 (Fla. 1953)(lease of property whereby lessee would operate a driving range and rental was determined by net profits from the operation was not a partnership).[37]

_____

[37]      Mention was made during the testimony about the Hillsborough County Aviation Authority's ("HCAA") long term lease of vacant land to a private company for private profit-making development. (See Ex. 205.)  There was no evidence that the lease itself was ever challenged.  In Weekly Planet, Inc. v. Hillsborough County Aviation Authority, 829 So.2d 970, 972 (Fla. 2d DCA 2002), the Florida Second District Court of Appeal discussed the lease in the context of a public records challenge to the confidentiality of subleases between the lessee and other private entities.  Holding that the subleases were not public records, the Second District summarized the HCAA's lease rent structure, and in dicta, commented that inasmuch as the authority was not sharing revenues, the agreement was not a partnership.

> The rent paid by Concorde [lessee] to the HCAA is set by a relatively complex rental clause.  The clause establishes a minimum rent of $1,000,000 per year for each year after 1998.  It establishes a "land rent" rate of $200,000 per year with an automatic rent increase of five percent at the expiration of every ten calendar years.  It further establishes an additional "development rent" based on the square footage of floor space in all buildings constructed on the leased land.  The rent is not a based on a percentage of gross or net receipts from any of the private businesses located at International Plaza.  Thus, the HCAA has not attempted to become a partner in this real estate development, and it has not taken the risk associated with a rental rate based on gross receipts or some other measure of commercial success of the

The relationship between the JAA and Majestic is not that of a joint venture because more than one of the necessary indicia of joint venture are missing.  First, Jackson-Shaw fails to note that Majestic will be contributing <u>all</u> capital costs toward infrastructure and improvements construction.  With the exception of the previously budgeted $750,000 road extension to build a public road, and up to 50 acres of wetlands mitigation which would likely be required for any development on the property,  JAA expends no additional money for capital costs.  Majestic, as the capital investor, stands to lose all of its investment should the project be unprofitable and bears that risk alone.  Additionally, while the parties did agree to share in the net profits, JAA never agreed to share in the losses (which would be the lost capital contributions made and debt incurred by Majestic) should the project prove unprofitable.  (PGL at 30, ¶ 2.15.1.)  In addition to not assuming any liability to Majestic's creditors or for Majestic's potential financial losses incurred in constructing the commercial development, the JAA will not be liable, under the terms of the Option and PGL, for any tort that occurs to third parties in connection with Majestic's development. (<u>See</u> Option at 11, ¶ 6.3; PGL at 6, ¶ 1.1.29.2; 22-24, ¶ 2.9.)  <u>See</u> <u>Advanced Protection Technologies, Inc. v. Square D Co.</u>, 390 F. Supp.2d 1155, 1161

---

<u>development</u>.

<u>Weekly Planet Inc.</u>, 829 So.2d at 972-73 (emphasis added).  The Court does not find the Second District's *dicta* controlling here.

(M.D. Fla. 2005)(no agreement to share in the losses).  The JAA has no "control" over the actual development of Woodwings East, other than the specific requirements set forth in the Option and PGL, such as requiring Majestic to adhere to the project's master plan.   Further, there is no evidence whatsoever that JAA is somehow "delegating" any "right of control" to Majestic, as Jackson-Shaw suggests.  See Sasportes v. M/V Sol de Copacabana, 581 F.2d 1204, 1208 (5th Cir. 1978).

Not only are JAA's and Majestic's "loss exposures" different, see USA Independence Mobilehome Sales, Inc., 908 So.2d at 1158, but JAA's risk that its land will not return a profit, is not a "sharing of the losses" required of a joint venturer.  See S & W Air Vac Systems, Inc., 697 So.2d at 1316 (property owner's "disadvantageous position relative to its competitors" should commercial enterprise of licensee prove unprofitable "fails to meet the loss requirement" for joint venture); Greiner v. General Electric Credit Corp., 215 So.2d 61, 63 (Fla. 4th DCA 1968) (foregoing rent for period of lease term not an agreement to share losses).  Finally, neither JAA nor Majestic has the authority to bind the other in any way in connection with the transaction.  See Kislak, 95 So.2d at 516.  While the JAA and Majestic may have a "'community of interest in the performance of a common purpose'" - the success of Majestic's Woodwings East commercial development -  they do not have a "joint proprietary interest in the subject matter" such that they have "joint control or right of control" in the development. See USA Independence Mobilehome Sales, Inc., 908 So.2d at

1158; 93 Fla. Op. Att'y Gen. 44, 1993 WL 369420, at * 3 (1993)(though parties have common interest in producing a profit from operation of the transferred property to ensure purchase price will be paid from future profits, transaction is not a joint venture in violation of Article VII, Section 10, because seller does not have any right of control over the property).[38]

---

[38]   Though Jackson-Shaw urged at oral argument that the term "joint owner" as found in Article VII, Section 10, has a "broader meaning" than "joint venture" or "partnership," Jackson-Shaw has cited no support illuminating the difference. "Joint ownership is not defined for purposes of the constitutional prohibition. Generally, however, the term 'ownership' connotes the 'right of one or more persons to possess and use a thing to the exclusion of others . . . involving as an essential attribute the right to control, handle, and dispose.'" 93 Fla. Op. Att'y Gen. 44, 1993 WL 369420, at * 2 (1993).   The few Florida sources discussing whether a transaction violates the "joint owner" prohibition of Article VII, Section 10, liken the term to "joint venture" or "partnership."   See Glatstein v. City of Miami, 399 So.2d 1005,1006 (Fla. 3d DCA 1981)(affirming summary judgment, without comment, against plaintiff's claim that a contract between the city and the partnership managing and operating an amusement park was a joint venture in violation of Article VII, Section 10); 2002 Fla. Op. Att'y Gen. 07, 2002 WL 76762 (2002)(city may not enter into a "partnership" with private corporation for provision of natural gas in contravention of "joint owner" prohibition of  Article VII, Section 10); 96 Fla. Op. Att'y Gen. 12, 1996 WL 75750, at * 2 (1996)(Article VII, Section 10 bars the "use of public funds in joint ventures and other cooperative projects with private entities"); 93 Fla. Op. Att'y Gen. 44, 1993 WL 369420 (1993)(port authority may enter contract for purchase of land using funds derived from future proceeds from the property and non-ad valorem tax revenues and not create a "joint ownership,  partnership, or joint venture prohibited by" Article VII, Section 10 because the seller has no right of possession or control).

In any event, JAA and Majestic are not "joint owners" having a joint proprietary interest in anything together; the JAA is fee simple owner of 328 acres of land called Woodwings East, and Majestic is owner of an option right to lease land, and under the PGL, the owner of a leasehold interest with the right to use and occupy the property for a fixed term of years, as well as owner of the

3.    "Give, Lend or Use" Public Credit To Aid Any Corporation

In the second prong of its constitutional attack on the JAA-Majestic transaction, Jackson-Shaw argues that the transaction violates Article VII, Section 10 because it "unlawfully lends 'public credit' to a private business." (Doc. 94-2 at 36.) Jackson-Shaw expert Watts testified that Majestic's "tying up of land," for no consideration "in a monetary sense," as provided by the Option, amounts to the JAA "giving or lending public credit." According to Watts, the Authority was "giving or lending the equity value of that land to the developer without any reciprocal public benefit," which qualifies as "a giving or lending of the creditworthiness of the government," in essence a "commitment of public funds." (Tr. III at 38, 42-43, 50-51, 53, 78.) Jackson-Shaw contends that the "lending of 'public credit' broadly encompasses giving public financial assistance to a private party in the form of public 'money,' 'property,' 'resources,' or 'financing.'" (Doc. 94-2 at 39.)

Article VII, Section 10 of the Florida Constitution prohibits the JAA from lending or using its credit to aid any private enterprise. State v. City of Miami, 379 So.2d 651, 653 (Fla. 1980). "If the [Authority] has not exercised its taxing power or pledged its credit, the obligation must merely serve a public purpose. [Citation omitted.] On the other hand, if the [Authority] has used either its taxing power or pledge of credit to

_____

improvements which it will make on the land (which will revert to the JAA at the termination of the ground lease).

support the issuance of bonds, the purpose of the obligation must serve a paramount public purpose and any benefits to a private party must be incidental." State v. Osceola County, 752 So.2d 530, 536 (Fla. 1999); see also Linscott v. Orange County Industrial Dev. Authority, 443 So.2d 97, 101 (Fla. 1983).

"The word 'credit,' as used in Fla. Const., art. VII, § 10 (1968), implies the imposition of some new financial liability upon the State or a political subdivision which in effect results in the creation of a State or political subdivision debt for the benefit of private enterprises." Nohrr v. Brevard County Educational Facilities Authority, 247 So.2d 304, 309 (Fla. 1971). "[T]he lending of credit means the assumption by the public body of some degree of direct or indirect obligation to pay a debt of the third party. Where there is no direct or indirect undertaking by the public body to pay the obligation from public funds, and no public property is placed in jeopardy by a default of the third party, there is no lending of public credit." State v. Housing Finance Authority of Polk County, 376 So.2d 1158 (Fla. 1979). "In order to have a gift, loan or use of public credit, the public must be either directly or contingently liable to pay something to somebody." Linscott, 443 So.2d at 100. See also Northern Palm Beach County Water Control District v. State, 604 So.2d 440, 442 (Fla. 1992).

Most persuasive is the case Bannon v. Port of Palm Beach District, 246 So.2d 737 (Fla. 1971) in which the Florida Supreme Court upheld the constitutionality of a

83

long-term lease of a publically owned island between the Port of Palm Beach District and a private developer.  Though the precise terms of the lease were unreported, the court determined that "by virtue of the lease agreement, [the District] did not become a joint owner or stockholder of the private tenant, nor did it lend, obligate or in any manner encumber its credit to the advantage of the tenant."  Bannon, 246 So.2d at 740-41. Important to the court's determination was the fact that the District's "participation in the transaction is limited to that of a lessor and does not involve any responsibility for the financing, promotion or development of the proposed project." Id. at 741.  "[T]he District has no financial responsibility and if all failed for the corporate tenant, the District would not bear any responsibility or obligation to the creditors nor would its ownership of the land be committed for such.  Its interest and credit remain free from attachment."  246 So.2d at 741.

In Bailey v. City of Tampa, 111 So. 119 (Fla. 1926), the Florida Supreme Court approved a conveyance of public land from the City of Tampa to the Tampa Board of Trade for the construction of a building, holding that it did not violate the predecessor constitutional provision prohibiting the extension of public credit to a private entity. Under the agreement, the board of trade was to build an 18-story building on the land "free of cost to said city, but at a cost of not less than $400,000 to the Tampa board of trade. . . . " Bailey, 111 So. at 120.  "[A] very large portion of said building was to be turned over for the use and disposal of said city at the time of completion, and that

within 35 years the whole of said building, including the lands on which it was located, reverted free of cost to the city, except such office space as may be necessary for the Tampa board of trade to carry out the purpose of its organization and to operate consistent with public interest." Id. If the building was not constructed within three years, the contract was void, and the land reconveyed to the city. Id. The court held the transaction did not violate the constitution because it "reveals no authorization on the part of the city of Tampa to become a stockholder in the Tampa board of trade, or to obtain or appropriate money for it, or to loan . . . ." Id. "Whether or not the contract was wise as a matter of policy was solely in the . . . discretion of the officers and electors of the city to determine." Id.

The court in Northern Palm Beach County Water Control Dist., 604 So.2d at 442, concluded that water control and improvement bonds to drain and reclaim land and for construction of roadways within a private golf course and residential development did not implicate Article VII, Section 10 because the bonds were to be repaid by special drainage assessments to the landowners for the improvements. 604 So.2d at 442. The general bond resolution provided that the district could not be compelled to exercise its taxing power to repay the bonds, and that the bonds "'shall not constitute a lien upon any of the facilities or properties' of the District." Id. See also 97 Fla. Op. Att'y Gen. 34, 1997 WL 348046 (1997)(airport may lease portion of property to private individual for 20 years for storage of his aircraft where city

85

determines property was not needed and city's credit or property was not placed in jeopardy by lease because the property was not used as security for costs of private entity building and maintaining the hanger).  <u>Compare</u> 92 Fla. Op. Att'y Gen. 71, 1992 WL 527481 (1992)(village prohibited from subordinating a mortgage taken back on sale of surplus property to construction mortgage secured by purchaser creating an indirect obligation by village to pay construction loan in order to protect its mortgage interest in the property); 86 Fla. Op. Att'y Gen. 20, 1986 WL 219755 (1986)(city may not pay debt incurred by private individuals for purposes of acquiring property subsequently donated to city); Fla. Op. Att'y Gen. 84-103, 1984 WL 182551 (1984)(city may not enter into contract of limited indemnity against financial losses to a private provider of emergency care).

Here, as in <u>Bannon</u> <u>supra</u>, JAA's participation in the transaction is limited to that of a lessor.  It has no responsibility for financing, promotion, or development of Majestic's commercial project.  The Authority bears no direct or indirect obligation to pay any debt and its fee interest in the 328 acre Woodwings East tract is not obligated, encumbered or in any way placed in jeopardy by any potential default by Majestic.  The Authority has taken on no obligation, either directly or contingently "to pay something to somebody."  <u>See</u> <u>Linscott</u>, 443 So.2d at 100.

Jackson-Shaw incorrectly equates alleged "public financial assistance" to Majestic to an unconstitutional lending of credit.  (Doc. 94-2 at 39.)  First, as counsel

for Jackson-Shaw acknowledged, the Authority's commitment to build a public road is not an unconstitutional pledge of credit.  Second, JAA's agreement to the Option in which Majestic has exclusive right to lease Woodwings East, at no cost to Majestic, and to participating ground leases for a rent amount allegedly less than market value, while arguably a favorable deal for Majestic, does not obligate or in any way encumber JAA's <u>credit</u> to the advantage of Majestic; at no point and under no circumstances will JAA be required to dip into the public coffers and appropriate money to make payment to Majestic or a direct or indirect payment to a third party creditor of Majestic.

Because the Authority is not pledging credit, the transaction "need only serve a public purpose rather than a paramount public purpose." <u>Northern Palm Beach County Water Control District</u>, 604 So.2d at 442.  This is because "[u]nder article VII, section 10, neither the state nor any of its subdivisions may expend public funds for or participate at all in a project that is not of some substantial benefit to the public, even where there is no . . . public indebtedness, subject to the exceptions set out therein." <u>State v. Miami Beach Redevelopment Agency</u>, 392 So.2d 875, 886 (Fla. 1980).  If the public benefit is present, it is immaterial that the primary beneficiary of the project is a private party.  <u>Linscott</u>, 443 So.2d at 101 (validating revenue bonds for construction of a regional headquarters building for an insurance company, serving public purpose of promoting economic benefits to the county).  "Of course,

public bodies cannot appropriate public funds indiscriminately, or for the benefit of private parties, where there is not a reasonable and adequate public interest.  An indirect public benefit may be adequate to support the public participation in a project which imposes no obligation on the public, and the qualification of the direct beneficiary complies with the principles of due process and equal protection." Id.

The extension of Alvarez Road into Woodwings East serves a public purpose; the Authority had previously budgeted the road improvement as a planned capital project, in accordance with its powers, and it will retain ownership of the public road. See City of Coral Gables v. Hayes, 74 F.2d 989, 991 (5th Cir. 1935);  Northern Palm Beach County Water Control District , 604 So.2d at 443.  Likewise, JAA's mitigating of wetlands on its own property does not constitute a payment of funds to Majestic and fulfills a valid public purpose. Cf. Modern, Inc. v. Florida, 6:03-cv-718-Orl31krs, 2006 WL 1679347, at *1 (M.D. Fla. June 19, 2006)(Florida Department of Transportation required to provide mitigation for wetlands disturbed by its widening of a state road).  Finally, the alleged "land bank" for Majestic, created by the Option encumbering all 328 acres of Woodwings East for five to fifteen years, without payment by Majestic, sufficiently furthers a public purpose by facilitating Majestic's revenue-producing development.  The Option creates no new financial liability, obligation or debt on the part of JAA and thus is not a lending of credit under either the letter or the spirit of Article VII, Section 10.

The Court will not "micromanage the arms-length business negotiations of the parties by striking discrete portions of a complex arrangement, which as a whole, . . . [is] substantially beneficial to the public." Poe v. Hillsborough County, 695 So.2d 672, 679 (Fla. 1997).  Whether or not the Majestic transaction will in fact meet JAA's expectations, JAA's attempt with this transaction to transform a dormant piece of property into a viable and area-compatible revenue-producing industrial and office park sufficiently fulfills a public purpose.[39]

The obvious benefit to Majestic, that is, the ability to make a profit from its use of JAA's land for up to 85 years in accordance with the terms of its Option and subsequent PGLs, is incidental to JAA's prime objective and  public purpose, which is to raise significant revenues for the Authority for decades to come.  JAA determined to agree to the terms of the Option and PGL that may be perceived as favorable to

---

[39]     Revenue-raising is a legitimate and "substantial government objective" for airports and the public authorities responsible for operating them.  Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Authority, 825 F.2d 367, 373 (11th Cir. 1987)(equal protection challenge of off-airport user fees); Astro Limousine Service, Inc. v. Hillsborough County Aviation Authority, 678 F. Supp. 1561, 1565 (M.D. Fla. 1988)(substantial government interest in revenue raising supports prohibition of noncontract carriers soliciting passengers).  Indeed, as noted by the Florida Supreme Court in determining that public land may be leased for private purposes, "it would be beneficial in many instances to lease surplus public property for non-public purposes so that the citizens and taxpayers would realize some tax relief resulting from the income." City of West Palm Beach, 291 So.2d at 578.  Cf. City of Bartow v. Roden, 286 So.2d 228, 229 (Fla. 2d DCA 1973)(ad valorem tax case; all income derived from leases of adjacent airport property to private nonaeronautical profit-making business used by the airport authority).

Majestic; however, this does not invalidate the overall public purpose.  See Poe, 695 So.2d at 679 (approving revenue bond issue by city to construct stadium and training facility for professional football team as meeting a paramount public purpose; the existence of a clause in the stadium lease granting the football team the first $2 million in net revenues from non-football events, while questionable, did not justify a finding that the transaction did not serve a paramount public purpose).

The Court finds that the JAA's agreement with Majestic does not violate the proscriptions of Article VII, Section 10 of the Florida Constitution.

### D.     Count III: Compliance With Chapter 315, Florida Statutes

Jackson-Shaw alleges that because "there has been no determination by the Authority's governing board that the proposed transaction with Majestic . . . is 'in the best interests' of the Authority," and because the "transaction is not 'in the best interests' of the Authority", the Option and the PGL violate Sections 315.02(5), 315.03(9), and 315.03(15), Florida Statutes.  (Doc. 65 at 8-9, ¶¶ 29-32.)  Jackson-Shaw requests the Court declare the Option and PGL null and void, and direct the JAA to comply with Chapter 315 "prior to leasing the Woodwings East Parcel."  (Id. at 10.)

The JAA's Charter provides that Chapter 315, entitled the 1959 Port Facilities Financing Law, is applicable to the Authority.  2004 Fla. Laws 464, § 13.  Section 315.03(9), cited by Jackson-Shaw, mirrors the JAA Charter provision, granting and

90

authorizing the JAA:

> (9)    To sell at public or private sale or lease for public or private purposes all or any portion of any port facilities now or hereafter owned by the unit, . . .  on such terms and subject to such conditions as the governing body[40] shall determine to be in the best interests of the unit.

Fla. Stat. § 315.03(9).  Similarly, Section 305.03(15) grants the Authority the power

> (15)  To lease or rent, or contract with others for the operation of all or any part of any port facilities . . . on such terms and for such period or periods and subject to such conditions as the governing body shall determine to be in the best interests of the units.

Fla. Stat. § 315.03(15).

Regardless of whether Chapter 315 affords Jackson-Shaw a private right of action to challenge the procedures employed by the JAA board in exercising its power to enter into a lease,[41] the facts do not support Jackson-Shaw's contention that the

---

[40]    Section 315.02(5) defines "governing body" as "the board or body in which the general legislative powers of a unit shall be vested." Fla. Stat. § 315.02(5).

[41]    The Bannon case, cited by Jackson-Shaw, (Doc. 94-2 at 60) is readily distinguishable.  In Bannon, supra, one of the issues raised was whether the Port of Palm Beach District had violated its statutory grant of power as set forth in Section 315.03.  246 So.2d at 738-39.  It is undisputed that the JAA has the power to lease its land to Majestic.

The parties provided no guidance as to whether the "grant of powers" section of Chapter 315 created a private right of action in Jackson-Shaw to challenge the procedures employed by the JAA board.  See generally Aramark Uniform and Career Apparel, Inc. v. Easton, 894 So.2d 20 (Fla. 2004)("[w]hether a violation of a statute can serve as a basis for a private cause of action is a question of legislative intent").

Board violated Chapter 315's grant of power to the Board to lease the Authority's property "subject to such conditions as [it] shall determine to be in the best interests of [the Authority]." Fla. Stat. § 315.03(15).

Two board members testified that they determined that the Majestic transaction was in the best interest of the JAA, calling it a "good deal." Further the JAA staff uniformly recommended the transaction to the board as being an excellent vehicle to accomplish the Authority's goals of utilizing its Woodwings East parcel to generate revenue and securing an aesthetic and uniform development. The Board twice unanimously passed on the transaction, first approving the concept on December 19, 2005, and finally approving the culmination of eight months of negotiations, on September 18, 2006. (Tr. II at 10; Exs. 127, 128, 196-98; Ct. Ex. 3 at 50-59; Ct. Ex. 6 at 66-67.) The evidence establishes that the Board determined that the transaction was in the best interest of the JAA.[42]  Thus, the JAA Board complied with the cited requirements of Chapter 315.

---

[42]     Whether the transaction is, in fact, in JAA's best interest (or will prove to be) is a policy question outside of this Court's purview.

92

**E.     Count V: Relief Under Chapter 119, Florida Statutes**
   **(Public Records)**[43]

In Count V, Jackson-Shaw alleges that JAA failed to produce all non-exempt public records requested on January 12, 2006, relating to the Woodlands East parcel, and that the "Authority's delay in producing all of its public records from the time of the Request to the filing of this claim is a violation of § 119.07(1)(a), Florida Statutes, and of Article I, § 24(a) of the Florida Constitution."  (Doc. 65 at 11-13, ¶¶39, 45, 46.) Jackson-Shaw contends that the failure to produce all documents "has caused, and continues to cause, irreparable harm to Jackson-Shaw," and asks the Court to direct the Authority to produce all records responsive to the January 12, 2006 request, and to award attorneys' fees.  (Id. at 13.)

Public records requests to JAA, which average 10 to 12 a month, have been handled for the past ten years by Lisa Hethington, JAA administrative assistant for external affairs.  Upon receipt of a public records request, Hethington contacts by e-mail JAA division heads and staff who may have responsive documents and requests that they to provide them to her.  She attaches the public records request to the e-

---

[43]     Count IV of Jackson-Shaw's Second Amended Complaint, entitled "Injunctive Relief," seeks preliminary and permanent injunctive relief enjoining the JAA from implementing the terms of the Option and PGL, and requiring the JAA to seek bids under Section 3(16) of Chapter 2004-464, Laws of Florida.  (Doc. 65 at 10-11.)  Inasmuch as the request for injunctive relief is subsumed by Counts I-III, which seek the same relief, and also because the Court has determined that the Option and PGL are lawful, the Court denies the relief sought by Count IV.

mail.   Hethington collects the responsive documents and produces them to the requesting party.   This was the procedure she employed for the public records request made by Jackson-Shaw, which form the basis of this claim. (Tr. II at 182-83, 197, 201; Ex. 193.)

Specifically, in mid-December 2005, JAA received a verbal request for documents made by the law firm which formerly represented Jackson-Shaw, to which the JAA responded.  This was followed by a written request on January 12, 2006, also from the law firm.  Responsive documents were produced by the JAA on January 20, 2006.  (Exs. 141-43.)  On May 1, 2006 and again on May 5, 2006, Jackson-Shaw's law firm requested, by e-mail, various specified documents be produced electronically, all of which were produced as requested.  (Tr. II at 203-04, 209; Ex. 193.)

Some items were not produced in response to the public records request.  (Tr. II at 191-96 (citing Exs.  88, 92, 94, 115, 128, 140).)   For instance, Majestic's November 15, 2005 PGL presentation to JAA, a 1½ inch document containing Majestic's proposal and *pro formas* (Ex. 99) was not produced in response to Jackson-Shaw's January 12, 2006 public records request, though the October 15, 2005 presentation (Ex. 84) was.  (Tr. II at 186.)  Also among the items not produced was the ill-considered January 2006 e-mail from Rossi to Majestic's Bohart referenced earlier.

Rossi said he first gave Hethington his entire file on Majestic as well as copies of e-mails with Majestic.  Upon further clarification, he also produced documents relating to Woodwings East.  Rossi testified that his failure to turn over two e-mails in response to the public records request "inadvertently happened. . . . [T]here was no intent to withhold anything."  (Tr. III at 233-34.)

JAA never denied any request for documents.  All documents requested, including those not previously produced, have since been produced to Jackson-Shaw in the course of this litigation.  (Tr. II at 205; Ex. 193.)  Thus, Jackson-Shaw's prayer for injunctive relief to require the Authority to produce all records responsive is moot.

The remaining relief requested, reasonable attorney's fees, is governed by Section 119.12:

> Attorney's fees. - If a civil action is filed against an agency to enforce the provisions of this chapter and if the court determines that such agency unlawfully refused to permit a public record to be inspected or copied, the court shall assess and award against the agency responsible, the reasonable costs of enforcement including reasonable attorneys' fees.

Fla. Stat. §119.12 (2006). "If public agencies are required to pay attorney's fees and costs to parties who are wrongfully denied access to the records of such agencies, then the agencies are less likely to deny proper requests for documents."  New York Times Co. v. PHH Mental Health Services, Inc., 616 So.2d 27, 29 (Fla. 1993).

The question presented here is 1) whether this is an action filed "to enforce the

provisions of [chapter 119]," and if so,  2) whether JAA's delay in producing all of the requested documents constitutes an "unlawful refusal" to provide access to the public records so as to justify an award of Jackson-Shaw's attorneys' fees.

As to the first element, there is no allegation or evidence that this lawsuit was filed in an attempt to gain access to public records and that the public records were produced as a result of this lawsuit. Compare Weeks v. Golden, 764 So.2d 633, 635 (Fla. 1st DCA 2000)("[c]learly the petition was filed 'to enforce the provisions of' chapter 119"; case remanded to determine if state attorney "'unlawfully refused'" production of documents).  Rather, Jackson-Shaw added its claim under Chapter 119 in its amended complaint, filed on March 30, 2006, three months after it had filed the initial complaint in this action.  (Docs. 1, 22.)  Cases awarding attorneys' fees to plaintiffs who received the requested documents after a lawsuit was filed to enforce the public records law and to obtain public records are inapposite.  See Mazer v. Orange County, 811 So.2d 857 (Fla. 5th DCA 2002); Puls v. City of Port St. Lucie, 678 So.2d 514 (Fla. 4th DCA 1996); Weeks, 764 So.2d at 635; Barfield v. Town of Eatonville, 675 So.2d 223 (Fla. 5th DCA 1996); Wisner v. City of Tampa Police Dept., 601 So.2d 296, 298 (Fla. 2d DCA 1992).  Nor is this a situation where the public agency refused production of the requested documents.  See Knight Ridder, Inc. v. Dade Aviation Consultants, 808 So.2d 1268 (Fla. 3d DCA 2002). The Court concludes that based upon the evidence presented, Section 119.12 is not applicable because

this was not an action filed to enforce Chapter 119.

However, inasmuch as it is unclear from the evidence whether Jackson-Shaw obtained the remaining requested documents before or after March 30, 2006 when it first filed its claim under Chapter 119, the Court also addresses whether JAA's delay in producing all responsive documents constitutes an "unlawful refusal" under Section 119.12. "An unjustified delay in complying with a public records request amounts to an unlawful refusal under section 119.12(1), Florida Statutes." Mazer, 811 So.2d at 860. The next step is to determine whether JAA's delay was "unjustified."

JAA administrative assistant Hethington testified that she followed normal procedures and notified all JAA personnel connected with the Woodwings East land transaction that the Authority had received a public records request. JAA produced 555 pages of documents, including bound materials and a number of large financial data charts, which had to be specially copied, within eight days of Jackson-Shaw's January 2006 request. (Tr. II at 205-07; Ex. 141.) Additional documents were provided to Jackson-Shaw in response to subsequent requests. Rossi testified his failure to turn over two e-mails to Hethington in response to the January 2006 public records request "inadvertently happened," and that he did not intend to withhold any documents. (Tr. III at 233-34.) The fact that one of the omitted documents (Ex. 140) might be construed as being negative to JAA's position in this lawsuit does not change the undisputed testimony that its omission from production was inadvertent.

97

The Court is not persuaded by the case of Barfield, supra, in which the court stated that the "Town's defense, that the delay in production of the records was caused by either the intentional wrongdoing or ineptitude of its Town clerk, amounts to an unlawful refusal and is not a valid basis for denying recovery of attorneys' fees and costs under section 119.12(1)." Barfield, 675 So.2d at 225. In that case, unlike the instant case, the "evidence clearly establish[ed] that it was only after the [plaintiff] filed a lawsuit that the documents he had previously sought by written request to the Town were finally turned over to him." Barfield, 675 So.2d at 224.

The evidence does not establish that the JAA was a "reluctant public agency" that wrongfully denied access to its records upon receipt of a proper request for public records. New York Times, 616 So.2d at 29. With no evidence that JAA ignored or otherwise failed to respond to the request, the Court cannot say that an inadvertent failure to include all documents in its otherwise timely and substantial response equates to an "unjustified delay" or "unlawful refusal" to permit a public record to be inspected.[44] The policy to be served by Section 119.12, requiring attorneys' fees as a sanction for unlawful refusal to provide records, is not applicable. See Woodfaulk v. State, 935 So.2d 1225, 1227 (Fla. 5th DCA 2006). Jackson-Shaw is not entitled to recovery of attorneys' fees.

---

[44]     Though the Court finds no violation on these facts, the Court assumes that JAA has tightened its public records procedures to prevent future recurrences.

98

### F.     Motion for Sanctions

On the third day of trial, it was disclosed by JAA on cross-examination that executive director Clark had actually signed the Majestic Option agreement on the day before trial, converting what up to then had been a proposed agreement into an executed transaction. (Tr. III at 151.) Plaintiff made an *ore tenus* motion for sanctions based on JAA's failure to disclose the execution of the agreement.  (Tr. III at 185.) A full recitation of the ensuing brouhaha is not necessary.  Suffice it to say that both JAA's witnesses and counsel should have immediately disclosed to the Court and opposing counsel the signing of the very agreement which is at the center of this lawsuit.   JAA's various explanations as to why it need not have done so were unpersuasive at best.  Nevertheless, JAA's lapse, though serious, was apparently not nefarious and it caused no real prejudice to plaintiff.  No purpose would be served by sanctions.  However, in the future, the Court expects more.

### Conclusion

Much of plaintiff's case is an attempt to show that JAA's approval of the Majestic transaction was ill-informed and ill-advised.  However, JAA's competence in its vetting of Majestic's proposal and its wisdom in agreeing to the terms of the Option and PGL are not  matters for this Court's consideration.  See State v. Sunrise Lakes Phase II Special Recreation Dist., 383 So.2d 631, 632 (Fla. 1980)  "It is not the function of the Court to pass upon the wisdom of [JAA officials], or to substitute its

99

opinion for theirs, but only to determine if their action was unlawful." <u>City of West Palm Beach</u>, 291 So.2d at 578; <u>see also</u> <u>Poe</u>, 695 So.3d at 679 ("[o]nly time will tell . . . if the policy choices made . . . were wise ones").  While reasonable persons may certainly disagree whether the JAA-Majestic transaction is good public policy, the Authority's action in approving it does not run afoul of the Florida Constitution, Florida Statutes, or JAA's Charter.

Based on these findings of fact and conclusions of law, it is hereby

**ORDERED**:

The Clerk is directed to enter judgment in favor of defendant Jacksonville Aviation Authority and against plaintiff Jackson-Shaw Company on all claims.

**DONE AND ORDERED** at Jacksonville, Florida, this 8th day of January, 2007.


TIMOTHY J. CORRIGAN
United States District Judge



j.
Copies to:
Counsel of Record